Teresa JOHNSON, Appellant,

v.

## MISSOURI DEPARTMENT OF HEALTH AND SENIOR SERVICES, Respondent.

### No. WD 64231.

Missouri Court of Appeals, Western District.

Aug. 9, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 2005.

As Modified Oct. 4, 2005.

Application for Transfer Denied Nov. 22, 2005.

See also 130 S.W.3d 619.

Matthew J. Eddy, St. Louis, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Ronald S. Molteni and Shannon Wright Morgan, Assistant Attorneys General, Jefferson City, MO, for Respondent.

Before EDWIN H. SMITH, C.J., and HOWARD and HOLLIGER, JJ.

EDWIN H. SMITH, Chief Judge.

Teresa Johnson appeals, in accordance with § 660.315.7, RSMo Supp.2003,[1] the decision of the Deputy Director of the Missouri Department of Health and Senior Services (Department), placing her name on the employee disqualification list (EDL), maintained by the Department, as provided in § 198.070. At the time of the Deputy Director's decision, January 27, 2003, the version of § 198.070 then in effect, provided:

> The department shall maintain the employee disqualification list and place on the employee disqualification list the names of any persons who have been finally determined by the department pursuant to section 660.315, RSMo, to have recklessly, knowingly or purposely abused or neglected a resident while employed in any facility.

§ 198.070.12.[2] A person listed on the EDL is:

> The department shall maintain the employee disqualification list and place on the employee disqualification list the names of any persons who are or have been employed in any facility and who have been finally determined by the department pursuant to section 660.315, RSMo, to have

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. Section 198.070 was amended in 2003. Subsection 12 was moved to subsection 13, which reads:

disqualified from holding any position in any public or private facility or day program operated, funded or licensed by the department or in any mental health facility or mental health program in which people are admitted on a voluntary or involuntary basis or are civilly detained pursuant to chapter 632, RSMo.

§ 630.170.1, RSMo Supp.2003. The Deputy Director's decision to place the appellant's name on the EDL resulted from the heat-related deaths of four elderly residents of the Leland Healthcare Center (LHC), a skilled nursing facility located in University City, Missouri, while the appellant was the administrator.

The appellant raises two points on appeal. In Point I, she claims that the Deputy Director erred in ordering that her name be placed on the EDL maintained by the Department because it was not supported by competent and substantial evidence upon the whole record; was arbitrary, capricious or unreasonable; and was an abuse of discretion due to its reliance on inadmissible hearsay evidence. In Point II, she claims that the Deputy Director erred in ordering that her name be placed permanently on the EDL because: (1) in determining the period of time her name should remain on the list, he misapplied § 660.315.9 in that he did not consider any mitigating circumstances; and (2) his decision was arbitrary and capricious in that it did not set forth the factors on which he relied.

We affirm.

knowingly or recklessly abused or neglected a resident. For purposes of this section only, "knowingly" and "recklessly" shall have the meanings that are ascribed to them in this section. A person acts "knowingly" with respect to the person's conduct when a reasonable person should be aware of the result caused by his or her conduct.

## Facts

The LHC is a three-story, 130–bed skilled nursing facility, located at 894 Leland Avenue in University City, Missouri. It is governed by the Omnibus Nursing Home Act, §§ 198.003–.186. As a skilled nursing facility defined by § 198.006(18), it provides nursing care and treatment services for

individuals requiring twenty-four hours a day care by licensed nursing personnel including acts of observation, care and counsel of the aged, ill, injured or infirm, the administration of medications and treatments as prescribed by a licensed physician or dentist, and other nursing functions requiring substantial specialized judgment and skill.

Pursuant to § 198.009, the LHC is subject to rules, regulations, and standards promulgated by the Department.

The appellant became the administrator of the LHC on March 16, 2001. At the time, she was licensed, in accordance with § 344.020, by the Missouri Board of Nursing Home Administrators as a professional nursing home administrator. In *Johnson v. Missouri Board of Nursing Administrators*, 130 S.W.3d 619, 623 (Mo.App.2004) (*Johnson I*), this court affirmed the judgment of the Circuit Court of Cole County affirming the decision of the Administrative Hearing Commission (AHC) upholding the Board's revocation of the appellant's license, in accordance with § 344.050.5. The appellant's license was revoked for incompetency, misconduct, gross negligence, and violations of various Board reg-

A person acts "recklessly" when the person consciously disregards a substantial and unjustifiable risk that the person's conduct will result in serious physical injury and such disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation.

ulations which were found to have caused or contributed to cause the heat-related deaths of four elderly residents of the LHC, which we discuss in detail, *infra.*

Approximately three weeks after the appellant became the administrator of the LHC, the temperature in the St. Louis area was unusually high. On Thursday, April 5, the temperature rose to 80° F. The normal high for the St. Louis area for the first part of April is between 63° and 65° F. The temperature rose steadily over the following four days, reaching 83° F on Friday, April 6; 85° F on Saturday, April 7; 87° F on Sunday, April 8; and 91° F on Monday, April 9. By Tuesday, April 10, the temperature had dropped to 75° F.

By Friday, April 6, the temperatures on the second and third floors of the LHC had begun rising to unsafe levels. As a result, the appellant and her staff implemented a plan in which a hydration cart, stocked with juice, water, tea, and popsicles, was to be moved throughout the facility in order to provide additional fluids to the residents. The LHC's social service director was assigned by the appellant as the responsible staff person in charge of the hydration cart.

The appellant left work on the evening of Friday, April 6, and did not return until Monday, April 9. Before leaving, she did not assign another staff member to take charge of the hydration cart for the periods of time that the director of social services would be gone over the weekend. When the appellant left the LHC Friday evening, she knew that the LHC's air conditioning system was not operating, but left no instructions with the staff concerning the air conditioning situation. Although the appellant spoke with the LHC's maintenance man, Pat McDonald, on April 5, 2001, about turning on the LHC's air conditioning system, the system was not actually turned on until after 10:00 p.m. on

Monday night. The air conditioning system was part of a heating and cooling system which had both a chiller and boiler. In order to activate the cooling system, it was necessary to drain the fluids which supported the boiler system, and fill it with fluids that supported the chiller. This was not done until Monday night, as described *infra.*

Over the weekend, the temperatures on the three floors of the LHC were exceedingly hot, especially on the third floor. Early Sunday morning, April 8, David Larkin, a paramedic with the University City Fire Department ("UCFD") was dispatched to the LHC in response to a call regarding an 85–year–old female resident, Theodora Hudson. When Larkin arrived in Hudson's room, which was on the third floor, other UCFD personnel were already there, and Hudson had been pronounced dead. Although he was only in her room for a few minutes, Larkin noticed that Hudson's room was "noticeably warm." Captain James Clayton of the UCFD, who had also responded to the call, noticed that "the entire third floor of the facility was stuffy, as was Ms. Hudson's room." In Hudson's death certificate, which was prepared by the Chief Medical Examiner of St. Louis County, the cause of death was listed as "hyperthermia" precipitated by "exposure to hot environment."

At approximately 9:55 a.m. on Monday, April 9, UCFD and UCPD personnel, including Captain Clayton and Officer Gary Smith, responded to an emergency call from the LHC regarding 70–year–old Freddie Burns, a female resident who lived on the second floor of the LHC. When they arrived, they learned that Burns had died a few minutes earlier of what the Chief Medical Examiner later determined was "hyperthermia." Denise Reynolds, the attending LHC nurse, told Officer Smith that the last time anyone

spoke to Burns was at approximately 9:00 a.m. While at the LHC, Captain Clayton noticed that the second floor was warm and stuffy. He advised a staff member at that time that the air conditioning needed to be turned on, and the staff member agreed. Officer Smith also noticed that the LHC's first and second floors were "extremely hot," causing him and his partner to perspire while they were inside.

At approximately 7:30 p.m. on the evening of Monday, April 9, Larkin was once again dispatched to the LHC, this time in response to a call regarding "some type of heat-related illness" affecting an 88–year–old female resident, Mary Moore, whose room was on the third floor of the facility. Even though he was wearing only a T-shirt, Larkin noticed that "it was so hot in Ms. Moore's room that it felt like an oven." A staff member advised Larkin that Moore's core body temperature was 108.8° F and that she had been running a fever all weekend. The staff member also advised that the LHC's air conditioning unit was "broken." Larkin told the staff member that the air conditioning needed to be turned on immediately, but was told that there was a "plumbing problem." Larkin then requested that staff move the third-floor residents downstairs, but one of the facility's certified nursing assistants told him "no." Moore received emergency medical treatment for heat exhaustion at the scene and was transported to the hospital by ambulance, where she died shortly thereafter. Moore's death certificate listed her cause of death as "hyperthermia" precipitated by "exposure to hot environment."

While at the hospital, UCFD paramedic Laurie Taylor, who had accompanied Larkin on the emergency call regarding Moore, contacted Captain Clayton and informed him of the conditions at the facility. Larkin and Taylor returned to the LHC, where they met with Captain Clayton and UCFD Battalion Chief Gerald Williams. At that time, Clayton and Williams spoke with Mark Smith, the LHC's evening supervising nurse, concerning the conditions and what needed to be done, including turning on the air conditioning. Smith told them that the air conditioning was "broken." Captain Clayton told Smith that he "needed to speak with his boss." Captain Clayton then spoke by phone with Dawn Scharplin, the director of nursing. Clayton explained to Scharplin that due to the extreme heat, the residents on the third floor were at risk. Clayton told her she had only two options: get the air conditioning system operational or get some fans running on the third floor. Chief Williams then talked to Gary Immel, a maintenance man. Immel told Williams he could have the air conditioning running within an hour, at which time Captain Clayton and Chief Williams returned to the firehouse.

At approximately 10:15 p.m., on Monday, April 9, UCFD paramedics and UCPD personnel, including Officer Lisa Dauernheim, responded to a call from the LHC to attend to a 66–year–old female resident Kay Jones, who, like Hudson and Moore, resided on the facility's third floor. Erma Hurd, one of the LHC's certified nursing assistants, told Officer Dauernheim that she was making her rounds when she discovered that Jones, who had recently suffered a stroke and had last been seen alive around 8:00 p.m., was not breathing. Hurd told Dauernheim that she called for help and began CPR, until the paramedics arrived and took over. Jones was dead upon Officer Dauernheim's arrival. Jones' death certificate indicated that the cause of death was the same as the other three residents who had died over the weekend, "hyperthermia" precipitated by "exposure to hot environment." Dauernheim observed that it was extreme-

ly hot, not only in Jones' room, but on the third floor in general. She also observed UCFD personnel, using a hand-held thermostat, measure the temperature on the third floor at 95° F and on the second floor at 90° F.

Officer Dauernheim also spoke to Immel while at the LHC. Immel told Dauernheim that the facility's cooling system "was not broken but was an old unit." Immel also told Dauernheim that a heating and air conditioning repair company, Grand Oaks Heating and Cooling, had been called "after residents complained of the heat." In that regard, Dauernheim noted that two workers from Grand Oaks Heating and Cooling were present when she arrived at the facility at approximately 10:15 p.m.

Larkin was among those officers responding to the Jones call. He noticed that Jones' room "felt like an oven" and that although one of the windows in her room was open, the blinds were down, which impeded air from passing through. Taylor, who also responded to the call, determined the core temperature of Jones' body to be 109.7° F. Dave Wall, another emergency responder, measured the temperature of Jones' room at 98° F. When he arrived, at approximately 10:15 p.m., Chief Clayton found that Jones' room was "extremely hot" and that the facility's air conditioning still had not been turned on. Another emergency responder measured the third floor temperature at 93° F.

Captain Clayton contacted the appellant and ordered her and her staff to immediately evacuate all residents from the third floor. Clayton set up a command post on the first floor, and with the help of the appellant's staff and UCFD and UCPD personnel, including Larkin and Dauernheim, began evacuating approximately forty residents from their rooms on the third floor to the first-floor dining room area, where they were given fluids and received other temporary care. Portable fans were set up in the dining area, and UCFD paramedics and the LHC nursing staff began taking the evacuated residents' baseline vital signs.

Captain Clayton spoke with Immel and noticed that workers from Grand Oaks Heating and Cooling were on site when Clayton arrived. Immel told Clayton that he had asked the appellant "to turn the air conditioning on earlier in the day on Monday, but she had said no." Immel also told Clayton that there had been a problem with the blower on the smaller of the facility's two central air conditioning units, but that it was being repaired as they spoke. Several minutes later, Immel told Clayton that the air conditioning units were running, but that it would take a while for the facility to cool down. After having his paramedics conduct a final check on the residents, Captain Clayton terminated his command and turned control of the LHC back over to the appellant.

At approximately 1:30 a.m. on Tuesday, April 10, Captain Clayton followed up with the appellant. She told him that the third floor was cooling down, but that the residents would remain in the first-floor dining area for the rest of the night. The appellant also told Clayton that her staff had moved several beds down into the dining area for the residents who had been evacuated and assured him that no residents would be placed back on the third floor until it was properly cooled.

The events of April 5–9, 2001, prompted an investigation by the Department, pursuant to § 198.070, to determine whether they demonstrated neglect by the appellant of the LHC residents. After the investigation was concluded, the Department made the determination to place the appellant's name on the EDL, and she was notified in writing, in accordance with § 660.315.1:(1) that an allegation had been

made against her, concerning her reckless neglect of the LHC residents, resulting in their deaths, and that an investigation had been conducted which substantiated the allegation; (2) that her name would be placed permanently on the EDL; (3) of the consequences of being listed on the EDL; (4) of her rights and the procedure to challenge the allegation.

On July 18, 2002, pursuant to § 660.315.3, the appellant filed a timely application for a hearing with the Department to challenge the allegation. The hearing was conducted on November 21, 2002, in accordance with the contested case provisions of Chapter 536, before the Director's designee, the Deputy Director. On January 27, 2003, pursuant to § 660.315.6, upon the record made at the hearing, the Deputy Director entered his decision and order determining that the appellant's name should be placed permanently on the EDL and stating the reasons for his decision, including findings of fact and conclusions of law.

In his order to place the appellant on the EDL, the Deputy Director concluded that there was "substantial and competent evidence that [the appellant] recklessly neglected the residents of the Leland Health Care Center, from April 5, 2001 until April 10, 2001, by failing to take necessary steps to ensure the protection of the fragile residents of the Leland facility from oppressive heat." He also concluded that:

> The evidence indicates that [the appellant] spoke with the facility maintenance man, Pat McDonald as early as April 5, 2001, regarding the air conditioning. It was asserted by Counsel that [the appellant] directed Mr. McDonald to start the air conditioning on April 5th and again on April 6th. It is not clear whether [the appellant] was aware of the process involved in shutting down the heating system and starting the air conditioning.

There was, however, substantial and competent evidence that the air conditioning was not operating on Friday, April 6, 2001, and that [the appellant] was aware of that fact when she left for the weekend. The evidence reflected that [the appellant] did not personally evaluate the upper floors of the facility, prior to leaving for the weekend. The evidence also reflected that [the appellant] left no instructions for the Director of Nursing (DON), regarding the air conditioning, when she departed from the facility for the weekend. The Record reflected that facility staff members were not aware of any policy regarding what to do with the residents, when faced with a harsh environment created by the heat. The Record further indicated that the facility, in fact, had no policy in place, during this April 5th—April 10th 2001 timeframe, to instruct staff on how to deal with the residents in such situations.

[The appellant's] Counsel argued that the DON was in charge during [the appellant's] absence over the weekend and, therefore, the DON was primarily responsible for the care of the residents during that time. Counsel further asserts that the DON never notified [the appellant] of any heat related problems. Counsel's assertion appears betrayed by a document contained within the stipulated evidence, which he himself alluded to on the Record. Investigators' notations indicate that the DON, on April 6th and again on April 9th of 2001, mentioned to [the appellant] that the facility was warm. On both occasions, the DON was noted to have been told that the Administrator [the appellant] and the Maintenance Supervisor were handling the problem. Regardless, Counsel's assertions are not persuasive, as they ignore the legal obligation imposed upon [the appellant] by State

Regulations, as well as [the appellant's] actual knowledge of the situation prior to, and upon leaving the facility for the weekend.

Admittedly, the Record reflects that attempts were made to hydrate the residents and that some fans were utilized to circulate air within the facility. Said efforts notwithstanding, the Record is replete with characterizations by staff, visitors, residents and emergency personnel that the facility was "hot," "stuffy," and "muggy." Firefighter/Paramedic Taylor's statements that the third floor "felt like an oven" and that resident Moore's room was "boiling hot," together with other similar characterizations within the stipulated record, clearly indicate that greater steps to ensure the health, safety, and welfare of the residents were necessary.

There is insufficient evidence in this matter to indicate that [the appellant] knowingly or purposely neglected the Leland facility residents. There is, however, competent and substantial evidence of [the appellant's] reckless neglect of the Leland residents. [The appellant] knew the air conditioning system was not working when she left the facility for the weekend. [The appellant's] knowledge and her subsequent inadequate course of action showed a conscious disregard of a substantial and unjustifiable risk of exposing the residents to dangerous conditions created by the heat. It is determined that [the appellant's] disregard of the heat related risks constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.

Having been aggrieved by the Deputy Director's decision, the appellant, on February 24, 2003, in accordance with § 660.315.7, sought judicial review of his decision in the Circuit Court of Cole County, as provided under Chapter 536, RSMo. On April 16, 2004, the court upheld the Deputy Director's decision to permanently place the appellant's name on the EDL.

This appeal followed.

### Standard of Review

■ Article V, section 18, of the Missouri Constitution provides for judicial review of administrative actions to determine "whether [such agency actions] are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." Mo. Const. art. V, § 18. Consistent with the constitutional standard, § 536.140.2 provides for appellate review of the administrative ruling, not that of the circuit court, to determine whether the administrative action:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

*Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 791 (Mo. banc 2004). In reviewing the Department's decision, we must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the decision; that is, whether the decision is contrary to the overwhelming weight of the evidence. *Id.* (holding that the stan-

dard of review set forth in *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. *banc* 2003), a workers' compensation case, is applicable to other administrative proceedings, as well).

## I.

In Point I, the appellant claims that the Deputy Director erred in ordering that her name be placed on the EDL maintained by the Department because it was not supported by competent and substantial evidence upon the whole record; was arbitrary, capricious or unreasonable; and was an abuse of discretion due to its reliance on inadmissible hearsay evidence. Specifically, she claims that the Deputy Director's decision was erroneous because it relied on the inadmissible hearsay testimony of Laurie Taylor, one of the emergency responders, and David Brown, a Department facility surveyor.

In determining the merits of the appellant's claim in this point, it is necessary to discuss the statutory scheme for placing a person's name on the EDL for the abuse or neglect of a resident of a facility governed by the "Omnibus Nursing Home Act," found in §§ 198.003 to 198.186. Section 198.003. Since the acts of neglect asserted by the Department for placing the appellant's name on the EDL and the hearing thereon occurred prior to the effective date of the 2003 amendments to the Act, August 28, 2003, the provisions of the Act discussed will be as they existed before they were amended in 2003, unless otherwise indicated.

## A. The Employee Disqualification List

Section 198.070.12 provided:

The department shall maintain the employee disqualification list and place on the employee disqualification list the names of any persons who have been finally determined by the department pursuant to section 660.315, RSMo, to have recklessly, knowingly or purposely abused or neglected a resident while employed in any facility.

A person listed on the EDL is:

disqualified from holding any position in any public or private facility or day program operated, funded or licensed by the department or in any mental health facility or mental health program in which people are admitted on a voluntary or involuntary basis or are civilly detained pursuant to chapter 632, RSMo.

§ 630.170.1, RSMo Supp.2003. A "facility," for purposes of § 198.070.12, was defined in § 198.006(6) as "any residential care facility I, residential care facility II, immediate care facility, or skilled nursing facility." The appellant does not dispute the fact that, at all pertinent times, the LHC was a "skilled nursing facility," as defined in § 198.006(17), and that she was an employee thereof. Likewise, she does not dispute the fact that the four victims in this case were "residents" for purposes of § 198.070.12, defined in § 198.006(14) as:

a person who by reason of aging, illness, disease, or physical or mental infirmity receives or requires care and services furnished by a facility and who resides or boards in or is otherwise kept, cared for, treated or accommodated in such facility for a period exceeding twenty-four consecutive hours.

Hence, there is no doubt that § 198.070.12 applied to the appellant to cause her name to be placed on the EDL by the Department, if, in fact, she were properly found by the Deputy Director, in accordance with § 660.315, to have recklessly, knowingly or purposely abused or neglected the four victims in question, resulting in their deaths.

Section 660.315.1 provided that after a determination is made by the Department

to place a person's name on the EDL, that person is to be notified of such, and § 660.315.3 provided that he has thirty days to request a hearing to challenge his name being placed on the list. The hearing is to be conducted by the Director or his designee, in accordance with the provisions for a contested hearing pursuant to Chapter 536. Section 660.315.5. Upon hearing the evidence, the Director or his designee shall determine all questions presented and whether to include the person's name on the EDL, stating the reasons for his decision and making findings of fact and conclusions of law. Section 660.315.6. A person aggrieved by the Director's decision to place his name on the EDL is free to seek judicial review in accordance with Chapter 536.

Having outlined the procedural aspects of placing a person's name on the EDL, we now turn to the appellant's claim that the Deputy Director's decision to place her name on the list was not supported by the evidence, was arbitrary and capricious, and was an abuse of discretion because it relied on hearsay testimony.

## B. Hearsay Testimony

The appellant claims that the Deputy Director's decision to place her name on the EDL was not supported by the evidence, was arbitrary and capricious, and was an abuse of discretion because it relied on hearsay testimony. Specifically, the appellant claims that in order to prove the elements of its case for placing her name on the EDL, the Department relied on the inadmissible hearsay testimony of Taylor and Brown. We need not reach the merits of this claim.

■ The appellant has the burden of establishing that the Deputy Director's decision was erroneous. *Smith v. Smiley Container Corp.*, 997 S.W.2d 126, 132 (Mo. App.1999). This burden includes developing a reasoned argument as to the claim raised in the Point Relied On, complete with citations to applicable authority. *Eagle ex rel. Estate of Eagle v. Redmond*, 80 S.W.3d 920, 926 (Mo.App.2002). In her brief, the appellant does nothing to develop an argument as to why the challenged testimony was inadmissible hearsay that the Deputy Director could not rely on in making his decision to place her name on the EDL, and she cites to no legal authority. She simply declares that the testimony of the witnesses in question was, in fact, inadmissible hearsay, and should have not been considered by the Deputy Director in deciding to place her name on the EDL, causing his decision to be infirm as claimed. She then proceeds to rehash all of the evidence and her reasoning as to why it does not support the Deputy Director's decision. Because the appellant's argument wholly fails to support her claim in this point, it is without merit. It is not this court's obligation to make the appellant's argument for her. *Speer v. K and B Leather Co.*, 150 S.W.3d 387, 389 (Mo.App. 2004). To do so, would make us her advocates, which we cannot do. *Id.*

## C. Issue Precluded by This Court's Prior Decision

■ Even if the appellant had properly developed her argument in support of her claim in this point, it would still fail. This is so in that the issue of whether the appellant "recklessly neglected" the four victims in this case, resulting in their deaths from hyperthermia, the basis on which the Deputy Director ordered the appellant's name be placed permanently on the EDL, was previously decided by this court in *Johnson I*. As such, the appellant is collaterally estopped from arguing on appeal in this case that the Department

failed to make a case for placing her name on the EDL.[3]

 Collateral estoppel, a.k.a. issue preclusion, "precludes relitigation of an issue previously decided and incorporated into an earlier judgment." *Sexton v. Jenkins & Associates, Inc.,* 152 S.W.3d 270, 273 (Mo. *banc* 2004). For an issue in the present action to be precluded by the doctrine of collateral estoppel: (1) it must be identical to an issue decided in a prior adjudication; (2) the prior adjudication must have resulted in a judgment on the merits; (3) the party against whom the doctrine is being asserted must have been a party or was in privity with a party to the prior adjudication; and, (4) the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the prior adjudication. *James v. Paul,* 49 S.W.3d 678, 682 (Mo. *banc* 2001). As we discuss, *infra,* each of these factors is satisfied to preclude the appellant from re-litigating in this case, the issue of whether she "recklessly neglected" the four elderly victims in this case, resulting in their deaths from "hyperthermia," the basis on which the Deputy Director ordered the appellant's name placed permanently on the EDL.

### 1. Identical Issue

In *Johnson I,* we affirmed the decision that the appellant was grossly negligent in that her "deviation from professional standards [was] so egregious that it demonstrate[d] a conscious indifference to her professional duties." 130 S.W.3d at 642. As we discuss, *infra,* that issue is identical

to the issue that confronts us here, whether the appellant "recklessly neglected" the four elderly residents of the LHC, resulting in their death.

"Neglect," for purposes of § 198.070.12, was defined in § 198.006(11) as:

the failure to provide, by those responsible for the care, custody, and control of a resident in a facility, the services which are reasonable and necessary to maintain the physical and mental health of the resident, when such failure presents either an imminent danger to the health, safety or welfare of the resident or a substantial probability that death or serious physical harm would result.

At the time, "recklessly" was not defined in § 198.070, as it is now. In that regard, § 198.070.13, RSMo Supp.2003, reads: "A person acts 'recklessly' when the person consciously disregards a substantial and unjustifiable risk that the person's conduct will result in serious physical injury and such disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation."

The Deputy Director, in the absence of a definition of "recklessly" in § 198.070.12, used the definition found in § 562.016.4, which reads: "A person '*acts recklessly*' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise

**3.** Collateral estoppel is an affirmative defense that was not raised below. However, we can raise it, *sua sponte,* under certain circumstances. *Cook v. Cook,* 143 S.W.3d 709, 711, n.2 (Mo.App.2004); *Patrick v. Koepke Const. v. Woodsage Const.,* 119 S.W.3d 551, 555 (Mo. App.2003). Two recognized circumstances are "when the defense arises out of the court's own earlier judgment, or when the

'demands of comity, continuity in the law, and essential justice' confront the court and all relevant records are before it." *Patrick,* 119 S.W.3d at 555 (citation omitted). Here, *Johnson I* was not final when the case at bar was pending so as to allow collateral estoppel to be raised. With that as a given, circumstances warrant our raising collateral estoppel, *sua sponte.*

in the situation." We assume that this was done due to the reference in § 198.070 to § 660.315. In that regard, § 198.070.12 provided and § 198.070.13, RSMo Supp. 2003, provides that the Department:

shall maintain the employee disqualification list and place on the ... list the names of any persons who are or have been employed in any facility and who have been finally determined by the department *pursuant to section 660.315, RSMo,* to have knowingly or recklessly abused or neglected a resident.

(Emphasis added.) Section 660.315 referenced and the amended version, § 660.315, RSMo Supp.2003, references Chapter 562, but only in the context of the length of time that a person's name is to remain on the EDL, not whether his name should be placed on the list in the first instance. In that regard, § 660.315.9 read and § 660.315.9, RSMo Supp.2003, reads: "The length of time the person's name shall appear on the employer disqualification list shall be determined by the director or his designee, based upon the following: (1) Whether the person acted recklessly, knowingly or purposely, as defined in chapter 562, RSMo[.]" Neither version of § 660.315.9 spoke or speaks in terms of using § 562.016.4 for the definition of "reckless" in determining whether to place the appellant's name on the EDL. Hence, the versions of § 198.070 and § 660.315.9 that were in effect when the Deputy Director made his decision to place the appellant's name on the EDL did not expressly authorize him to use the definition of "reckless" found in § 562.016.4.

 If a statute defines a term or phrase, that definition must be used.

*State ex rel. Nixon v. Estes,* 108 S.W.3d 795, 798 (Mo.App.2003). In the absence of such a definition, a definition used in a similar legal context may be employed. *Weston Point Resort Condominium Owners' Association, Inc. v. Floro,* 796 S.W.2d 928, 930 (Mo.App.1990). In that regard, both the prior and present versions of § 660.315.9 provided and provide that in determining the length of time a name is to remain on the EDL, the Director or his designee is to consider, *inter alia:* "Whether the person acted recklessly, knowingly or purposely, as defined in chapter 562, RSMo." In the absence of a definition of "knowingly" and "recklessly" in the prior version of § 198.070, it seems logical that the legislature intended that the same definition of those terms used in determining how long a name is to remain on the EDL would apply in determining whether to place a person's name on the EDL. *See id.* (holding that we are to interpret statutes to determine the intent of the legislature). Hence, we read the prior versions of § 198.070 and § 660.315 as implicitly requiring the Deputy Director to employ the definition of "recklessly" provided in § 562.016.4 in determining whether to place the appellant's name on the EDL, which he did.[4]

 We realize that the logic we employ in interpreting the prior versions of §§ 198.070 and 660.315 as implicitly dictating that the definitions of "knowingly" and "recklessly" found in § 562.016.4 be used in determining whether to place a person's name on the EDL, as well as the length of time it is to remain once placed, is severely tested by the provisions of the present versions of §§ 198.070, RSMo Supp.2003,

---

4. We base our reading of the prior versions of §§ 198.070 and 660.315, as to the definitions of "knowingly" and "recklessly," for the purpose of determining whether to place a person's name on the EDL, as opposed to determining the period of time it is to remain on the list once placed, on the fact that the legislature intended to use the same definitions of those terms in § 562.016.4.

and 660.315, RSMo Supp.2003. As written, §§ 198.070.13, RSMo Supp.2003, and 660.315.9, RSMo Supp.2003, expressly provide that in determining whether to place a name on the EDL, the Department is to use the definitions of "knowingly" and "recklessly" set forth in § 198.070.13, RSMo Supp.2003, whereas, § 660.315.9, RSMo Supp.2003, requires that in determining the length of time the name is to remain on the list, the Department is to consider "[w]hether the person acted recklessly, knowingly or purposely, as defined in chapter 562, RSMo." Frankly, we can find no reason or logic for employing these different definitions in determining whether to place a person's name on the EDL and the length of time the name is to remain thereon. However, it matters not to our present discussion and moreover, it is not our job to question the reasonableness of a statute that is clear as to legislative intent. *Messer v. King*, 698 S.W.2d 324, 325 (Mo. *banc* 1985). The legislature is free to enact laws that it deems reasonable, free from the meddling of the courts as to their reasonableness. *State v. Pilkinton*, 310 S.W.2d 304, 309 (Mo.App. 1958).

Employing the definition of "neglect" found in § 198.006(11):

> the failure to provide, by those responsible for the care, custody, and control of a resident in a facility, the services which are reasonable and necessary to maintain the physical and mental health of the resident, when such failure presents either an imminent danger to the health, safety or welfare of the resident or a substantial probability that death or serious physical harm would result[,]

and the definition of "recklessly" found in § 562.016.4:

> [a] person "acts recklessly" or is reckless when he consciously disregards a substantial and unjustifiable risk that

circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation[,]

to place the appellant's name on the EDL for reckless neglect, the Department had to show, by substantial and competent evidence, that: (1) the appellant was responsible for the care, custody, and control of the four elderly residents of the LHC that died; (2) she failed to provide the services that were reasonable and necessary to maintain their physical and mental health; (3) her failure constituted a gross deviation from the standard of care which a reasonable person would exercise in the same situation; and, (4) in failing to provide the residents reasonable and necessary services, the appellant consciously disregarded a substantial and unjustifiable risk of imminent danger to their health, safety or welfare, or a substantial probability that their death or serious physical harm would result. Hence, in deciding whether the issue of the appellant's "reckless neglect" of the LHC residents is precluded from being litigated in this case, pursuant to the doctrine of collateral estoppel, by the prior adjudication in *Johnson I*, the question is whether these proof elements of "reckless neglect" were decided in that prior proceeding.

*Johnson I* was an appeal of an administrative proceeding, which revoked the appellant's license to practice as a nursing home administrator, pursuant to § 344.050.5. That subsection provides that a nursing home administrator's license may be suspended or revoked upon a finding by the AHC that one or more of thirteen grounds enumerated in § 344.050.2 are met. These grounds include "incompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the func-

tions or duties of any profession licensed or regulated by this chapter," § 344.050.2(5), and "violation of, or assisting or enabling any person to violate, any provision of this chapter, or of any lawful rule or regulation adopted pursuant to this chapter." § 344.050.2(6). The AHC revoked the appellant's license for violating numerous state regulations, and for gross negligence and incompetence. This court affirmed the revocation on all the grounds found in support thereof. The question is whether these findings were sufficient to establish the proof elements of "reckless neglect" for placing the appellant's name on the EDL, which we discuss, *infra*.

## A. Care, Custody, and Control

As in this case, it was admitted in *Johnson I* that the appellant was the nursing home administrator for the LHC at the time of the deaths of the four residents. In *Johnson I,* this court discussed "the extensive responsibilities Missouri law places on nursing home administrators." 130 S.W.3d at 637. In that regard, we noted that 13 CSR 73–2.095, which was adopted pursuant to § 344.070, and which defines the standards of professional conduct for a nursing home administrator, imposes numerous responsibilities pertaining to the care, custody, and control of residents, including that:

(1) The administrator shall—

(A) Be held responsible for informing him/herself of the needs of the residents and the needs of the facility and apprise the operator of these needs on a routine basis;

(B) Be held responsible for the actions of all employees with regard to Chapter 198, RSMo, unless—

1. Upon learning of the violation, the administrator attempted to immediately correct the violation;

2. The administrator did not sanction the violation; and

3. The administrator did not attempt to avoid learning of the violation;

(C) Establish and enforce policies and procedures to safeguard patient or resident care;

(D) Establish and enforce policies and procedures for the protection of residents' rights, funds and property;

(E) Establish and enforce policies and procedures for all nursing home rules as stated in 13 CSR 15;

(F) Not permit or allow another person to use his/her nursing home administrator license for any purpose;

(G) Report through the proper channels the incompetent, unethical or illegal practice of any health care professional; and

(H) Devote reasonable time and attention to the management of the health, safety and welfare of the residents of the facility.

*Id. (quoting* 13 CSR 73–2.095(1)). In addition, we found that a nursing home administrator was personally responsible, by virtue of 13 CSR 73–2.095(1)(E), for establishing and enforcing policies and procedures to ensure:

The building shall be substantially constructed and shall be maintained in good repair.

Facilities shall use air-conditioning units, a central air-conditioning system, fans or a ventilating system when the room temperature exceeds eighty-five degrees Fahrenheit (85° F) to meet the reasonable comfort needs of individual residents.

All persons who have any contact with the residents in the facility shall not knowingly act or omit any duty in a manner which would materially and adversely affect the health, safety, welfare or property of a resident.

Each resident shall receive twenty-four (24)-hour protective oversight and supervision.

Each resident shall receive personal attention and nursing care in accordance with his/her condition and consistent with current acceptable nursing practice.

The facility must provide each resident the opportunity to access sufficient fluids to maintain proper hydration in accordance with the resident's medical condition and goals of treatment as documented in the medical record.

*Id.* at 638–39. Given the record in *Johnson I*, it is clear that the issue of whether the appellant was responsible for the care, custody, and control of the four elderly residents of the LHC at the time of their death was decided in the affirmative.

## B. Failure to Provide Services

As to the second proof element of "reckless neglect," in *Johnson I*, this court determined that there was sufficient evidence to support a finding that the appellant failed to provide the services that were reasonable and necessary to maintain the physical and mental health of the residents. Specifically, we affirmed the AHC's determination that:

[The appellant] violated 13 CSR 73–2.095(1)(A) in that she failed to keep herself informed as to the needs of the residents and the needs of the facility as the indoor temperature at Leland rose higher and higher during the four-day period from April 6–9, 2001.

[The appellant] violated 13 CSR 73–2.095(1)(B)1. in that upon her arrival at Leland on Monday she did not attempt to immediately correct her staff's failure, in violation of §§ 198.088.1(6)(g) and (i), to protect the third-floor residents from the physical and emotional harm they had suffered due to the excessive heat over the weekend or to treat them with

consideration and respect in the treatment and care for their personal needs. Instead, after four residents had perished from hyperthermia, Captain Clayton of the UCFD was forced to order Johnson and her staff to evacuate the residents from the third floor.

[The appellant] violated 13 CSR 73–2.095(1)(C) in that she failed to enforce policies and procedures to safeguard residents from the excessive heat.

[The appellant] violated 13 CSR 73–2.095(1)(D) in that she failed to enforce policies and procedures to protect residents' rights to be free from physical and mental harm.

[The appellant] violated 13 CSR 73–2.095(1)(E) in that she failed to enforce policies and procedures:

To have the building's air conditioning unit maintained in good repair when the inside temperature exceeded 85° F and to meet the reasonable comfort needs of individual residents, as required by 13 CSR 15–14.032(1) and (30).

To oversee residents to ensure that they received appropriate nursing and medical care, as required by 13 CSR 15–14.042(3).

To ensure that employees who had contact with residents did not knowingly omit duties in a manner that materially and adversely affected the health, safety and welfare of residents, as required by 13 CSR 15–14.042(16).

To ensure that residents received 24–hour protective oversight and supervision or personal attention and nursing care in accordance with their conditions, as required by 13 CSR 15–14.042(66) and (67).

To provide each resident the opportunity to access sufficient fluids to maintain proper hydration in accordance with

the resident's medical condition, as required by 13 CSR 15–14.042(71).

To implement responsive plans of action, as required by 13 CSR 15–14.042(81).

To ensure that the rooms had sufficient ventilation to keep them free of excessive heat, as required by 13 CSR 15–17.020(8), and to keep residents free from mental and physical abuse, as required by 13 CSR 15–18.010(20).

*Id.* at 639–40. Thus, it was clearly decided in *Johnson I* that the appellant failed to provide services that were reasonable and necessary to maintain the physical and mental health of the four LHC residents who died.

## C. Gross Deviation from the Standard of Care and Conscious Disregard of Substantial and Unjustifiable Risk

As to the two remaining proof elements of "reckless neglect," sufficient to place the appellant's name on the EDL in accordance with § 660.315, we will address them together, in determining the issue of collateral estoppel, in that they are inextricably intertwined concepts.

As we noted, *supra,* in *Johnson I* we affirmed the AHC's determination that the appellant was grossly negligent in her response, or lack thereof, to the events of April 2001. The term "gross negligence" is not statutorily defined for the purposes of § 344.050.2. *Johnson,* 130 S.W.3d at 642. Consequently, in *Johnson I,* this court adopted the definition of gross negligence used by the AHC, which was taken from *Duncan v. Mo. Bd. for Architects, Professional Engineers and Land Surveyors,* 744 S.W.2d 524 (Mo.App.1988), another license revocation case. *Id. Duncan* defined gross negligence as "an act or course of conduct which demonstrates a conscious indifference to a professional duty." 744 S.W.2d at 533.

Applying the *Duncan* definition of "gross negligence" in *Johnson I,* the AHC determined that the appellant's "deviation from professional standards [was] so egregious that it demonstrates a conscious indifference to her professional duties." 130 S.W.3d at 642. This court affirmed the AHC's findings. *Id.* at 643. Thus, in effect, we found that there was sufficient evidence to establish that the appellant's conduct in April of 2001 was a gross deviation from the standard of care of a reasonable nursing home administrator. Moreover, we determined that the AHC properly found that the appellant demonstrated "a conscious indifference" to her professional duties, which included her duty to protect the residents from physical harm due to the excessive heat during the period in question. Inasmuch as four residents died from the physical harm from which the appellant failed to protect them, this was a finding, in effect, that the appellant consciously disregarded a substantial and unjustifiable risk of imminent danger to the residents' health, safety or welfare, or a substantial probability that their death or serious physical harm would result.

Inasmuch as all four proof elements of "reckless neglect," for purposes of the EDL, were decided against the appellant in *Johnson I,* the identical-issue requirement of collateral estoppel is satisfied.

### 2. Judgment on the Merits

■ For the purposes of collateral estoppel, a "judgment on the merits is one rendered after argument and investigation and when it is determined which party is in the right, as distinguished from a judgment rendered upon some preliminary or technical point, or by default, and without trial." *St. Louis University v. Hesselberg Drug Co.,* 35 S.W.3d 451, 455 (Mo.App. 2000) (citations omitted). In *Johnson I,*

the AHC upheld the revocation of the appellant's license pursuant to the Missouri Board of Nursing Home Administrators' motion for a summary determination authorized by 1 CSR 15–2.450(4),[5] which we found is very similar to the summary judgment procedure provided in Rule 74.04. 130 S.W.3d at 626.[6] Inasmuch as a summary judgment, rendered in accordance with Rule 74.04, is considered a judgment on the merits for purposes of collateral estoppel, *Hesselberg Drug Co.*, 35 S.W.3d at 455, the judgment in *Johnson I* satisfied the judgment-on-the-merits requirement of collateral estoppel.

### 3. Party to Prior Adjudication

It is beyond dispute that the appellant was a party to the prior adjudication. The procedural history of the administrative revocation of her license to practice as a nursing home administrator is described in detail in *Johnson I*, and indicates that the appellant was served with the original and amended complaints filed by the Board of Nursing Administrators, filed answers to the complaints, and then invoked her privilege against self-incrimination under Article I, § 19 of the Missouri Constitution and the Fifth Amendment of the United States Constitution, in response to the Board's requests for admissions and production of documents, and to nearly all of the Board's interrogatories, as well as to the Board's motion for summary determination. 130 S.W.3d at 623–24.

### 4. Full and Fair Opportunity to Litigate

As to the fourth factor of collateral estoppel, whether the appellant had a full and fair opportunity in *Johnson I* to litigate the issue of whether she "recklessly neglected" the four LHC residents, the record indicates that she did. In making this determination, we considered whether: (1) the appellant had a strong incentive to litigate the first action; (2) this proceeding afforded the appellant procedural opportunities not available in *Johnson I;* (3) the judgment in *Johnson I* is inconsistent with one or more prior judgments; and (4) the forum in *Johnson I* was substantially inconvenient to the appellant. *Hesselberg Drug Co.*, 35 S.W.3d at 455–56.

As to the first factor, the appellant obviously had a strong incentive to litigate the first action in that it was a proceeding to revoke her license to practice as a nursing home administrator. As to the second factor, whether the appellant was afforded more procedural opportunities in *Johnson II* than in *Johnson I* to litigate the issue of reckless neglect, the answer is no. Her opportunities were the same. And, the fact that the appellant in *Johnson I* invoked her privilege against self-incrimination, 130 S.W.3d at 623–24, did not change that fact. As this court concluded in *Johnson I*, "the type of proof the Board was forced to rely on in support of its allegations that Johnson's license to practice as a professional nursing home administrator was subject to discipline was a direct result, not of any illegal or improper 'procedural shortcuts' taken by the AHC, but Johnson's decision to invoke her Fifth Amendment rights." *Id.* at 646. Thus, her procedural opportunities were not greater in this case than in *Johnson I*. In *Johnson I*, she simply chose not to avail herself of those opportunities.

**5.** This regulation was rescinded effective November 30, 2002, and replaced by 1 CSR 15–3.440(3) ("Summary Determination and Other Decisions Without Hearing").

**6.** All rule references are the Missouri Rules of Civil Procedure, 2005, unless otherwise indicated.

As to the third and fourth factors of a full and fair opportunity to litigate, the judgment in *Johnson I* was clearly not inconsistent with any other prior judgments, and the forum was obviously not substantially inconvenient to the appellant in that the only hearing on the Board's motion for summary determination was conducted over the telephone. As such, all four factors of the fourth factor of collateral estoppel, a full and fair opportunity to litigate, were satisfied.

In conclusion, all four requirements for issue preclusion are met in this case, so that the appellant would be precluded from challenging the Deputy Director's decision that she "recklessly neglected" the four victims in this case, resulting in their deaths from hyperthermia, the basis on which the Deputy Director ordered that her name be placed permanently on the EDL.

Point denied.

## II.

In Point II, the appellant claims that:

[t]he Administrative Tribunal erred and did not follow the applicable law in placing [the appellant's] name on the Employee Disqualification List permanently because the Tribunal did not consider any mitigating circumstances as required by Section 660.315(9) R.S.Mo., and its Decision was arbitrary, capricious, unreasonable and constituted an abuse of discretion, contrary to Section 536.140.1 R.S.Mo., in that it failed to discuss any factors concerning the appropriate length of time for Ms. Johnson's name to remain on the List.

The appellant's Point Relied On (PRO) fails to comply with Rule 84.04(d), governing proper PROs.

 Rule 84.04(d)(1) provides:

(1) Where the appellate court reviews the decision of a trial court, each point shall:

(A) identify the trial court ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

The point shall be in substantially the following form: "The trial court erred in [identify the challenged ruling or action], because [state the legal reasons for the claim of reversible error], in that [explain why the legal reasons, in the context of the case, support the claim of reversible error]."

Thus, the rule requires that a proper PRO must: (1) identify the ruling or action of the trial court that is being challenged on appeal; (2) state the legal reason or reasons for the claim of reversible error; and (3) explain in summary fashion why, in the context of the case, the legal reason or reasons support the claim of reversible error. *Lombardo v. Lombardo*, 120 S.W.3d 232, 247 (Mo.App.2003). Compliance with Rule 84.04 briefing requirements is mandatory in order to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made. *Franklin v. Ventura*, 32 S.W.3d 801, 803 (Mo.App.2000). The failure to comply with Rule 84.04(d) warrants dismissal of the appeal. *Young v. Ernst*, 113 S.W.3d 695, 697 (Mo.App. 2003).

 The appellant's PRO fails to explain in summary fashion why, in the context of this case, the legal reason or reasons support the claim of reversible error. Her point is nothing more than an abstract statement of the law, which is unaccepta-

ble in satisfying the requirements of Rule 84.04(d). *Lombardo,* 120 S.W.3d at 247. In essence, all she claims is that the trial court was wrong. The appellant's failure to comply with Rule 84.04(d) is sufficient reason to dismiss the appellant's claim of error. *Young,* 113 S.W.3d at 697.

 Although Rule 84.04 violations constitute sufficient grounds for dismissal of an appeal, we are able to ascertain the appellant's arguments, and so we review her claims *ex gratia* in an effort to provide a determination on the merits. *In re Gianella,* 111 S.W.3d 416, 419 (Mo.App.2003). In the argument portion of the appellant's brief, she essentially claims that there were mitigating circumstances, which, had the Department properly considered them, would have mandated a limit to the amount of time that she was placed on the EDL. The appellant claims that these mitigating circumstances include her short time on the job, the unusual nature of the April 2001 heat wave, the "antiquated" nature of the Center's air conditioning system, the "possibility of cooler temperatures arriving thereby necessitating a change in the system back to heating from air conditioning," the measures which the appellant did initiate in response to the heat, and the pre-existing medical conditions of the residents who died.

Section 660.315.9 provides:

The length of time the person's name shall appear on the employee disqualification list shall be determined by the director of the department of health and senior services or the director's designee, based upon the following:

(1) Whether the person acted recklessly or knowingly, as defined in chapter 562, RSMo;

(2) The degree of the physical, sexual, or emotional injury or harm; or the degree of the imminent danger to the health, safety or welfare of a resident or in-home services client;

(3) The degree of misappropriation of the property or funds, or falsification of any documents for service delivery of an in-home services client;

(4) Whether the person has previously been listed on the employee disqualification list;

(5) Any mitigating circumstances;

(6) Any aggravating circumstances; and

(7) Whether alternative sanctions resulting in conditions of continued employment are appropriate in lieu of placing a person's name on the employee disqualification list. Such conditions of employment may include, but are not limited to, additional training and employee counseling. Conditional employment shall terminate upon the expiration of the designated length of time and the person's submitting documentation which fulfills the department of health and senior services' requirements.

It is clear from the record that the degree of physical harm that resulted from the appellant's reckless neglect—the deaths of four residents of the Center—was an ample basis for the Department's decision to place the appellant's name permanently on the EDL. The appellant makes no persuasive argument otherwise.

Point denied.

## Conclusion

The decision of the Department, affirming the decision of its Administrative Tribunal to permanently place the appellant's name on the employee disqualification list, is affirmed.

HOWARD and HOLLIGER, JJ., concur.