Denise BUDDING, Appellant,

v.

SSM HEALTHCARE SYSTEM,
et al., Respondents.

No. SC 82214.

Supreme Court of Missouri,
En Banc.

May 30, 2000.

Jeffrey J. Lowe, St. Louis, for appellant.

Kenneth W. Bean, Carl J. Geraci, St. Louis, for respondents.

Joanne E. Joiner, Associate General Counsel, Jefferson City, for Missouri Hospital Association, amicus curiae.

HOLSTEIN, Judge.

Denise Budding sued SSM Healthcare System[1] (Hospital) for personal injuries arising from defectively designed Vitek[2] proplast teflon temporomandibular joint implants. Budding had the implants inserted at the Hospital and proceeded on a theory of strict product liability. The jury rendered a verdict in favor of the Hospital, and the trial court entered judgment accordingly. Budding appealed. Following opinion by the Missouri Court of Appeals, Eastern District, the case was transferred here. This Court has jurisdiction. *Mo. Const. art. V, sec. 10.* The judgment of the trial court is affirmed.

## I.

■ This Court reviews facts in a light favorable to the verdict. *Bell v. May Dep't Stores Co.,* 6 S.W.3d 871, 873 (Mo. banc 1999). As a teenager, Budding began to experience pain in her jaws. Eventually her condition worsened, leading to headaches and difficulty eating. In 1983 Budding visited Dr. Kenneth Rotskoff who diagnosed her with temporomandibular joint disease. In order to treat her condition, Dr. Rotskoff scheduled Budding for surgery in May 1984 at the Hospital. During the procedure, he concluded that it would be impossible to rebuild Budding's joint and Vita teflon implants would be necessary to correct her problem. At that point, Dr. Rotskoff obtained the implants from the inventory the Hospital had ordered and provided at his request. After selecting the implants, he sized and surgi-

cally inserted them. The Hospital never billed Budding for the devices.

Following the surgery, Budding's condition improved. She was able to return to work, perform household chores, eat solid food and lead a fairly normal life. An occasional headache and minimal pain were the only symptoms that persisted after she received the implants. However, in 1990, Budding again started to suffer from severe pain. She again contacted Dr. Rotskoff. He examined her and recommended x-rays be taken. Then, in March 1991, he sent Budding a letter requesting her to come in for an examination and informing her of an FDA warning about the safety hazards posed by the implants.

Finally, in April 1993 Budding decided to schedule surgery to remove the implants. During the operation, Dr. Rotskoff discovered a giant cell tumor and found one of the implants had fixated to the base of Budding's skull. As he tried to remove this implant, part of the skull broke off leaving a hole in the floor of Budding's temporomandibular joint. The hole resulted in a cerebral spinal fluid leak which entered the joint through the new hole. At that point, a neurosurgeon was called in to patch the leak. Due to these unexpected complications, Dr. Rotskoff was only able to remove one of the implants. Budding required additional surgery to have the other implant extracted.

Dr. Rotskoff scheduled Budding for the additional operation three weeks later on April 30, 1993. Between the surgeries, she experienced severe pain, suffered facial nerve weakness, facial numbness, bite-joint pain, hearing impairment, pain in the side of her head, heat sensations on her face and seizure-like episodes. The second operation proceeded relatively well, permitting Dr. Rotskoff to remove the re-

---

1. Two defendants were involved in the lawsuit, SSM Healthcare System and SSM Healthcare System II. Each owned St. Mary's Health Center at different times. For simplicity's sake, both are referred to in the singular as was the case at trial.

2. Vitek, the manufacturer, filed for bankruptcy, and Budding's claim was discharged therein.

maining implant without any additional complications. While recovering from this procedure, Budding again suffered similar pain and sensations to those experienced following the previous surgery.

In October 1995, Budding sued the Hospital on a theory of strict liability for using what she alleged were defectively designed implants. She suggested implants made of teflon were prone to excess fragmentation and wear. Since teflon is extremely bioreactive, this increases the chance a giant cell foreign body reaction will occur, similar to hers, causing the destruction of bone and tissue. As noted above, this argument failed to persuade the jury, which returned a verdict in favor of Hospital.

## II.

■ Budding's first claim on appeal asserts the trial court erred in requiring the use of the word "sale" instead of "transfer" in the verdict directing instruction relating to products liability. This claim of error assumes that a health care provider is strictly liable for a products liability claim where the health care provider "transfers" a defective medical device to a patient. Because the Court concludes that chapter 538[3] forecloses any such claims for strict products liability, the Court need not reach the question presented.

Section 538.205(5) defines "Health care services" to include the "transfer to a patient of goods or services ... in furtherance of the purposes for which an institutional healthcare provider is organized." (Emphasis added).

Section 538.225.1 mandates:

In any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services, the plaintiff or his attorney shall file an affidavit with the court stating that he has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

The affidavit must be filed within ninety days after the filing of the petition unless extended for good cause. *Sec. 538.225.4.* If a plaintiff fails to file such affidavit, the trial court may dismiss the petition. *Sec. 538.225.5.*

■ The Court's role in interpreting these statutes is to "ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning." *State ex rel. Riordan v. Dierker,* 956 S.W.2d 258, 260 (Mo. banc 1997). In determining the legislature's intent in adopting the various provisions of chapter 538, several conclusions are obvious. First, by using the words "any action" in sec. 538.225.1, the legislature clearly demonstrated its intent that the statute not only apply to a negligence action but to a products liability action as well. Second, the legislature intended the provisions of the chapter to apply not only to services but to transfers of goods to a patient in furtherance of a health care institution's purpose. Third, the legislature intended to impose specific limitations on the traditional tort causes of action available against a health care provider. Included in these limitations is not only a cap on noneconomic damages, sec. 538.210, and structured settlements of future damages, sec. 538.220, but the requirement that the cause of action be dependent upon an affidavit by a "legally qualified health care provider" of failure to exercise reasonable care attributable to the defendant health care provider, sec. 538.225.[4]

---

3. All statutory references are to RSMo 1994.

4. Contrary to dicta in *Mahoney v. Doerhoff Surgical Servs., Inc.* . 807 S.W.2d 503, 508 (Mo. banc 1991), nothing in sec. 538.225 ex-

It is true that nothing in the statute specifically requires the plaintiff to prove negligence or other level of culpability in order to recover. However, in construing the statute, the Court is not to assume the legislature intended an absurd result. *Akers v. Warson Garden Apartments*, 961 S.W.2d 50 (Mo. banc 1998). It would be an obvious absurdity to require an affidavit of negligence as a condition of proceeding with the cause of action even though negligence need not be proved in order to submit the case to a jury or to obtain a judgment. On that basis alone, it is reasonable to conclude that the legislature intended to eliminate liability of health care providers for strict liability.

Further buttressing the conclusion that strict liability is not applicable to health care providers is sec. 538.300. That section provides that the provisions of sec. 537.760 to sec. 537.765, relating to products liability actions, are not applicable to actions against health care providers. Section 537.760 codifies sec. 402A of the *Restatement (Second) of Torts. Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 65 (Mo. banc 1999).[5] The exception of health care providers from the provisions codifying strict products liability is yet another clear indication that the general assembly intended to abrogate such liability for health care providers. Just as enactment of sec. 537.760 codified strict products liability, the exception provided for in sec. 538.300 was intended to eliminate such statutory liability for health care providers.

Perhaps the best explanation for the statutory silence regarding strict liability for providing a defective medical device is found in the state of the common law regarding products liability claims against health care providers in this state prior to the enactment of chapter 538 in 1986. At that time, the only case in which the courts of this state had considered strict liability against a health care provider was that of *Hershley v. Brown*, 655 S.W.2d 671 (Mo. App.1983). There the court of appeals held that products liability was not applicable to a physician who implanted a medical device in a patient. *Id.* at 675. It found persuasive a Wisconsin case refusing to impose strict liability upon a surgeon for injuries arising from a lung biopsy. *Hoven v. Kelble*, 79 Wis.2d 444, 256 N.W.2d 379 (1977). In addition, the court cited a California case holding strict liability inapplicable to a physician for injuries resulting from a prescribed medication. *Carmichael v. Reitz*, 95 Cal.Rptr. 381, 17 Cal. App.3d 958 (1971). Relying on *Carmichael*, the California courts that same year considered whether products liability was applicable to a hospital in *Silverhart v. Mount Zion Hosp.*, 98 Cal.Rptr. 187, 20 Cal.App.3d 1022 (1971). In that case, the court refused to extend products liability to a hospital for injuries caused by a broken surgical needle. Against that backdrop, the only additional safeguards to assure against strict products liability claims were the requirements of an affidavit of negligence and to make clear that the codification of strict liability for defective products was inapplicable to health care providers.[6] Thus, the general assembly intended that liability of health care providers be rooted in a culpable state of mind that gives rise to traditional tort liability and not in strict liability relating to the transfer of products under the *Restatement*

empts a plaintiff from filing an affidavit who shows "that the medical malpractice ... is of that untypical kind that does not require proof of standard of care by expert opinion."

**5.** Budding cites *Connelly v. Iolab Corp.*, 927 S.W.2d 848 (Mo. banc 1996), to argue that secs. 537.760 to 537.765 did not codify common law products liability. That case merely stated that "plaintiffs have asserted common

law causes of action under Missouri law." *Id.* at 851. In context, that statement does not contradict the fact that the common law cause of action has now been codified.

**6.** Section 538.300 was enacted as part of the same bill as sec. 537.760 to sec. 537.765 in 1987.

*(Second) of Torts* sec. 402A, as codified in sec. 537.760.

The Court is mindful that since adoption of chapter 538, a number of cases have been decided by the court of appeals of this state allowing a plaintiff to bring a strict products liability action against a hospital where the hospital transferred a defective medical device to a patient. In *Bell v. Poplar Bluff Physicians Group*, 879 S.W.2d 618 (Mo.App.1994), the court adopted the reasoning of the dissent in *State ex rel. American Medical Int'l, Inc. v. Sweeney*, 845 S.W.2d 648 (Mo.App.1992) (Maus, J., dissenting). The dissent in *Sweeney* agreed that sec. 538.225, requiring an affidavit of fault attributable to the defendant health care provider, applied to a hospital that sells or transfers a surgical implant to a patient but construed that section to require only an affidavit that the health care provider sold a defective product. *Id.* at 652–53. *Bell,* by its reliance on *Sweeney,* would eliminate the clear legislative requirement of an affidavit that a health care provider "failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances" and that such failure caused injury to the plaintiff. To accept an affidavit of a lower standard of care than negligence or a different cause of injury than the defendant health care provider's fault is to rewrite the statute, not construe it. *Bell* has been followed in *Brandon v. Southeast Missouri Hospital, Inc.*, 926 S.W.2d 113 (Mo.App.1996), and *Pinkerton v. Southeast Missouri Hosp. Ass'n,* 926 S.W.2d 137 (Mo.App.1996).

More recently, *Bell* was taken a step further in *Mulligan v. Truman Medical Ctr.,* 950 S.W.2d 576 (Mo.App.1997). Like *Bell,* the *Mulligan* court would permit a strict liability case to proceed against a health care provider without the affidavit of fault mandated by sec. 538.225. In addition, the *Mulligan* court construed sec. 538.300 as intended to retain common law strict products liability against health care providers, even though such liability had been specifically rejected in the single Missouri case in which such claim was raised prior to enactment of sec. 538.300. To the extent *Bell, Brandon, Pinkerton* and *Mulligan* are inconsistent with the text and history of chapter 538, they are overruled.

■ The legislature has spoken with reasonable clarity expressing an intent to eliminate liability of health care providers for strict products liability. All canons of statutory construction are subordinate to the requirement that the Court ascertain and apply the statute in a manner consistent with that legislative intent. *Butler v. Mitchell–Hugeback, Inc.,* 895 S.W.2d 15, 19 (Mo. banc 1995). As the briefs of the parties point out, appealing public policy arguments can be made both for and against imposing strict liability where a health care provider transfers a defective product to a patient. However, when the legislature has spoken on the subject, the courts must defer to its determinations of public policy.

## CONCLUSION

The Court concludes that because plaintiff did not make a submissible case against the Hospital based on negligently providing a defective implant, any error in the instruction on the subject is not prejudicial. The judgment of the trial court is affirmed.

PRICE, C.J., LIMBAUGH, WHITE, WOLFF, and BENTON, JJ., concur; COVINGTON, J., not participating.