**DEPARTMENT OF SOCIAL SER-
VICES, DIVISION OF MEDI-
CAL SERVICES, Appellant,**

v.

**SENIOR CITIZENS NURSING HOME
DISTRICT OF RAY COUNTY d/b/a
Shirkey Leisure Acres, Respondent.**

No. WD 66236.

Missouri Court of Appeals,
Western District.

Feb. 13, 2007.

Rehearing Denied March 27, 2007.

David P. Hart, Assistant Attorney General, Jefferson City, MO, for appellant.

Harvey M. Tettlebaum, Jefferson City, MO, for respondent.

Before JOSEPH M. ELLIS, Presiding Judge, ROBERT G. ULRICH, Judge, and RONALD R. HOLLIGER, Judge.

JOSEPH M. ELLIS, Judge.

The Missouri Department of Social Services, Division of Medical Services ("DMS"), appeals from a judgment entered in the Circuit Court of Cole County affirming a decision by the Administrative Hearing Commission ("the Commission") granting the Senior Citizens Nursing Home District of Ray County ("Ray County") a $3.63 increase in its Medicaid per diem rate.

Ray County is a not-for-profit nursing home district, doing business as "Shirkey Leisure Acres," operating a long-term care facility in Richmond, Missouri, licensed under state law as a skilled nursing facility and a residential care facility. Prior to 2003, Ray County had 141 skilled nursing beds in its facility, 128 of which were located in semi-private rooms. In 2003, Ray County decided to build a new wing and to thereby convert many semi-private rooms into private rooms containing one bed each. Later, Ray County also sought to add ten additional beds. Accordingly, the new wing as finally proposed would consist of 66 rooms.

## FACTUAL AND REGULATORY BACKGROUND

Before Ray County could proceed with construction, it was required to secure a Certificate of Need ("CoN") from the Missouri Health Facilities Review Committee ("the MHFRC"). Providing care to patients in the new facility required a license from the Department of Health and Senior Services ("DHSS"). And finally, in order to receive Medicaid reimbursement for such care, Ray County needed certification from DMS, the Appellant herein.

### A. Certificate of Need

▮ MHFRC is the agency within DHSS that administers the CoN laws, §§ 197.300 to 197.366.[1] "The purpose of the certificate of need program is to reduce unnecessary duplication in health care facilities and to reduce the cost of health care." *Community Care Ctrs., Inc. v. Missouri Health Facilities Review Committee*, 735 S.W.2d 13, 14 (Mo.App. W.D.1987).

Before Ray County could begin construction of the new addition, it was required to obtain a Certificate of Need (CoN) from MHFRC. *§ 197.315.* It submitted the required Letter of Intent and Application to MHFRC, describing its intent to add a new wing to the upper level of the facility, to convert 42 of its existing semi-private rooms into private rooms, to close two of the existing semi-private rooms, and to place 46 beds from the preexisting portion of the facility (one each from the 42 rooms and two each from the closed rooms) into private rooms in the newly-constructed wing. MHFRC issued a Certificate of Need dated November 25, 2002, approving the planned construction.

After the construction commenced, Ray County decided to construct an addition to

---

**1.** All statutory references are to RSMo 2000 & Supp.2005, unless otherwise noted.

its lower-level Alzheimer's Unit and to convert the existing two-bed rooms in the Alzheimer's Unit to one-bed rooms. It also decided to add ten new beds to the new Alzheimer's Unit. For the new beds in the Alzheimer's Unit, the record reflects that Ray County was only required to obtain a Non–Applicability letter, and that was issued by MHFRC on January 8, 2003.

## B. Licensure

Before Ray County could place residents in the new wing, it was required to have the beds licensed. The Division of Senior Services and Regulation, Section on Long Term Care Standards is the agency within DHSS that administers licensing. On February 21, 2003, Ray County submitted to DHSS a DA–113 form entitled "Bed Classification for Licensure and Certification by Category." It requested licensure for 151 beds and reflected one bed in each of the rooms formerly containing two beds and one bed in each of the newly constructed rooms. DHSS inspected the facility and issued a letter on April 22, 2003, approving the DA–113 form and enclosing an amended license reflecting the 151 beds. The amended license noted a "10 bed increase effective 4/22/03 (141 + 10 = 151 Beds)."

## C. Certification

Certification is DHSS's permission to participate as a provider in Medicaid. The DA–113 form submitted to DHSS by Ray County also requested that all beds be certified for participation in Medicaid. The DHSS letter of April 22, 2003, to Ray County approving its DA–113 form also approved the change in certification. This is the only document DHSS sends to a Medicaid provider reflecting its recommendation on a change in certification. DHSS documented the change in certified

capacity that same day by issuing a Certification and Transmittal form that was transmitted to DMS reflecting certification of 151 beds.

## D. Medicaid Rate

DMS is an agency within the Department of Social Services, and it is responsible for administering payments under the Medicaid program. It determines each provider's reimbursement rate for providing services to Medicaid beneficiaries. On July 3, 2003, Ray County requested an increase in its Medicaid per diem rate based on the construction of the new wing to the facility containing 66 new beds and the increase in the facility's overall licensed capacity by ten beds. DMS made the claim effective as of July 1, 2003. On November 3, 2003, DMS granted a $0.78 increase in its Medicaid per diem rate for only the ten additional beds placed in service in the facility. DMS denied the claim for a rate adjustment as to the other 56 beds. On December 23, 2003, DMS issued a final decision letter to Ray County, upholding its decision to increase the facility's Medicaid per diem rate by only $0.78 for the ten additional beds.

Ray County appealed DMS's decision to the Commission. Following a hearing, on April 11, 2005, the Commission issued its decision finding that Ray County was entitled to a per diem adjustment for all 66 beds in its new wing, ten of which were deemed "additional beds" and 56 of which were deemed to be "replacement beds." The Commission concluded that Ray County was entitled to a per diem increase of $3.63.

DMS appealed the Commission's decision to the Circuit Court of Cole County. On October 24, 2005, the Circuit Court affirmed the Commission's decision without issuing any findings of fact or conclu-

sions of law. DMS brings two points on appeal.

## STANDARD OF REVIEW

"On appeal, we review the Commission's decision, rather than that of the trial court." *Moheet v. State Bd. of Registration for Healing Arts,* 154 S.W.3d 393, 397 (Mo.App. W.D.2004). The scope of our review of the Commission's decision is prescribed by § 536.140.2. *Cedar Hill Manor, L.L.C. v. Department of Soc. Servs., Div. of Med. Servs.,* 145 S.W.3d 447, 450 (Mo.App. W.D.2004). Pursuant to that statute, we must determine whether the Commission's administrative action:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

*Johnson v. Missouri Dep't of Health & Senior Servs.,* 174 S.W.3d 568, 577 (Mo. App. W.D.2005). "In reviewing the . . . decision, we must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the decision; that is, whether the decision is contrary to the overwhelming weight of the evidence." Id. "We will not substitute our judgment for that of the Commission on factual matters, but questions of law are matters for the independent judgment of this court." *Moheet,* 154 S.W.3d at 398.

## ANALYSIS

The crux of the entire appeal is the interpretation and application of DMS's Regulation 13 CSR 70–10.015, captioned "Prospective Reimbursement Plan for Nursing Facility Services" ("the Plan"). The Commission ruled that the 56 beds transferred from the pre-existing wing of Ray County's facility to the new wing were "replacement beds" for purposes of the Plan and that, therefore, Ray County was entitled to a rate adjustment for those beds. For this reason, we must first address the meaning of the word "beds" as used in the Plan and as applicable to this appeal. Part of DMS's arguments before the Commission was that a "bed" for purposes of the Plan means an article of furniture and that is all. In other parts of its argument, however, DMS asserted a more expansive definition of the word. In its decision, the Commission undertook a four-page examination of the meaning of the word. It ultimately concluded that the word "beds" as used in the Plan did not mean furniture alone. Rather, it defined a bed for purposes of the Plan as "a measure of a facility's capacity to provide care." In their briefs to this Court, DMS and Ray County now agree with the Commission's definition. We agree with the Commission's reasoning and utilize the same definitional approach in our analysis.

## POINT I.[2]

In its first point, DMS contends that the Commission erred in classifying

---

**2.** We have chosen to address the merits of DMS's appeal, but DMS's brief is certainly not a model of compliance with Rule 84.04. Rule 84.04(d) and (e) generally contemplate a single issue to be presented in each Point Relied On and the argument thereunder. DMS's brief sets this concept on its head and makes for an extremely confusing and tedious argument by, for example, having three major sub-sets of argument and an extensive num-

the 56 beds in the new wing as "replacement beds" and granting an increase in Ray County's per diem rate on that basis for those replacement beds. DMS asserts that the beds do not qualify as replacement beds under the applicable regulations and that Ray County failed to provide the requisite materials to support such a rate adjustment.

DMS first contends that Ray County was not entitled "to obtain additional Medicaid funds for its conversion of semi-private rooms to private rooms where additional costs corresponding to private rooms are not reimbursable in a facility's Medicaid rate absent extenuating circumstances." DMS directs our attention to § 6(A) of the Plan, which generally provides that a private room is a non-covered service unless it is necessary to isolate a patient because of a medical or social condition. It then acknowledges that Ray County is not "requesting a higher Medicaid per diem rate because its residents now reside in private rooms." But it asserts that Ray County is trying to recover its capital costs associated with conversion of semi-private rooms to private rooms and

that Ray County is not entitled thereto. Beyond DMS's bold assertion, it cites to no authority for its contention, and we find none.

## A. Delicensure

■ DMS next argues that Ray County "did not qualify for a rate adjustment for replacement beds because it failed to have the same number of beds 'delicensed' with" DHSS, which it claims is required by § 13(B)6 of the Plan. Section (13)(B)6 of the Plan provides, in pertinent part:

(B) Special Per Diem Rate Adjustments. Special per diem rate adjustments may be added to a qualifying facility's rate without regard to the cost component ceiling if specifically provided as described below.

\* \* \*

6. Replacement beds. A facility with a prospective rate in effect on or after January 1, 1995, may request a rate adjustment for replacement beds that resulted in the same number of beds being delicensed with the Division of Aging or the Department of Health.[3]

---

ber of sub-sub-etc arguments within each declining sub-division of Point I. The following is a diagram of DMS's Point I, which covers 38 pages of argument in the brief:

Point I
 A.
 B.
 1.
 a.
 b.
 2.
 a.
 b.
 c.
 d.
 C.
 1.
 a.
 b.
 c.
 2.
 a.

 b.
 c.
The arguments contained in DMS's Point I should have been presented in at least three separate points on appeal, and perhaps more. Nevertheless, " '[w]here possible, . . . [this court's] preference is to dispose of a case on the merits rather than to dismiss an appeal for deficiencies in the brief.' 'In the interests of justice' this court 'may decide points when their basis is cognizable from the argument section of the brief.' " *City of Plattsburg v. Davison*, 176 S.W.3d 164, 169 (Mo.App. W.D. 2005) (Internal citations omitted). We are able to understand the issues and therefore decide the merits.

3. By Executive Order 01–02, dated January 5, 2001, the Division of Aging was transferred to the renamed Department of Health and Senior Services. *Exec. Order No. 01–02 (2001), available at http://www.sos.mo.gov (Click:*

The facility shall provide documentation from the Division of Aging or the Department of Health that verifies the number of beds used for replacement have been delicensed from that facility. The rate adjustment will be calculated as the difference between the capital component per diem (fair rental value (FRV)) prior to the replacement beds being placed in service and the capital component per diem (FRV) including the replacement beds placed in service as calculated in subsection (11)(D) including the replacement beds in service. The capital component is calculated for the replacement beds using the asset value per licensed bed as determined using the R.S. Means Construction Index for nursing facility beds adjusted for the Missouri indexes for the date the replacement beds are placed in service.

DMS notes that this section provides that a facility can only request a rate adjustment for replacement beds if the same number of beds are delicensed "with" DHSS.

In addressing this contention, the Commission noted that the Plan contains no definition of the term "delicense." It found, and it is supported by the record, that DHSS has no procedure to "delicense" beds and that the Plan has no provision for same. The Commission observed, however, that § (4)(II) of the Plan defined "licensed bed" as a "bed meeting the licensing requirement of . . . [DHSS]." It reasoned that a bed that no longer meets the licensing requirements is delicensed for purposes of the Plan. Accord-

ingly, the Commission found "that beds delicensed are simply taken out of service and replaced under a single license."

DMS claims that these findings were unsupported by any evidence in the record and that the Commission erred in its interpretation of the regulations. It points to selective testimony from Darrell Hendrickson, the Director of the Division of Senior Services and Regulation, Section on Long Term Care Standards, to the effect that beds are only delicensed if there is a decrease in capacity. But there is other testimony from Mr. Hendrickson that would suggest otherwise. In particular, he testified that one could correctly view the one-bed reductions in the rooms in Ray County's old wing as delicensing and a relicensing of beds in the new wing.

As noted by the Commission, the terms "delicense" and "delicensed" are not among the 52 words and phrases specifically defined in the Plan. In addition, neither DHSS, including its Section on Long Term Care Standards that is supposedly responsible for "delicensing" beds, nor DMS has a written or otherwise identifiable procedure for delicensing beds. And, as Mr. Hendrickson's overall testimony verifies, it is somewhat a matter of semantics as to what DHSS considers "delicensing." In light of this and as discussed below, the Commission did not err in its interpretation of the Plan, and its factual determination was supported by substantial and competent evidence and was not against the overwhelming weight of the evidence.

*State Library; Reference Services; Governor's Executive Orders–Under "Search Executive Orders," Type 01–02).* Section 660.060, RSMo Supp.2004, statutorily transferred "[a]ll authority, powers, duties, functions, records, personnel, property, contracts, budgets, matters pending and other pertinent vestiges of the division of aging . . . to the department of health and senior services." DHSS has assigned the Division of Aging's functions as set forth in 13 CSR 70–10.015 to the Division of Senior Services and Regulation, Section on Long Term Care Standards. DMS, despite numerous amendments of the Plan since 2001, has not modified the regulation to reflect the change.

 The Commission correctly interpreted the law in deciding that Ray County had delicensed the beds. Regulations are interpreted according to the same rules as statutes. *Teague v. Mo. Gaming Comm'n*, 127 S.W.3d 679, 685 (Mo.App. W.D.2003). In interpreting regulations, the words must be "given their plain and ordinary meaning." Id. at 686. Context determines meaning. *Keller v. Marion County Ambulance Dist.*, 820 S.W.2d 301, 302 (Mo. banc 1991). Regulations should be interpreted reasonably, and absurd interpretations should not be adopted. *Budding v. SSM Healthcare Sys.*, 19 S.W.3d 678, 681 (Mo. banc 2000).

 A facility is entitled to an increase in its Medicaid per diem rate for "replacement beds that resulted in the same number of beds being delicensed with [DHSS]. The facility shall provide documentation from [DHSS] that verifies the number of beds used for replacement have been ***delicensed*** from ***that*** facility." *13 CSR 70–10.015(13)(B)6* (emphasis added). Thus, by definition, replacement beds are those that are put in service in place of existing Medicaid beds that have been delicensed. *See also 13 CSR 70–10.015(4)(VV)* (defining replacement beds as beds "put in service in place of existing Medicaid beds"). Also, the beds must be delicensed from ***that*** facility. Thus, the beds cannot have been delicensed from some other facility.

From the context, it is clear that beds are "delicensed" when they are taken out of service and replaced with other beds. Thus, when Ray County removed from service the beds in the old portion of the facility and replaced them with new beds in the new portion of the facility, it delicensed them. Ray County indicated this change on its DA–113 form, which shows licensure by room. DHSS approved the change. The Commission did not err in

interpreting the law on this point, and its findings were supported by the record.

DMS next goes into an extended argument that Ray County did not request that DHSS delicense beds. The contentions are for the most part redundant in that they are essentially rehashing what constitutes delicensing and why DMS believes it did not occur in this case. Nevertheless, we will briefly address the claims.

DMS's assertion that Ray County did not request that DHSS delicense beds is wholly without merit. There is nothing in the Plan that required Ray County to request that DHSS delicense beds. Section (4)(VV), defining "Replacement beds," does not refer to delicensing beds at all. And § (13)(B)6 merely states that replacement beds resulted in "the same number of beds being delicensed ***with*** [DHSS]" and that the facility provide documentation from DHSS verifying that "the number of beds used for replacement have been delicensed." (Emphasis added). In other words, the beds must be delicensed in some fashion ***with*** DHSS, but there is no requirement that a request be made to DHSS or even that DHSS take any action to delicense. Rather, the beds need only be delicensed with DHSS, which, consistent with the Commission's findings, could simply mean notifying DHSS by filing a DA–113 form. In short, there is nothing in the Plan requiring a ***request*** for delicensure.

DMS then continues to argue that some formal action by DHSS was required to delicense beds. It does so, presumably, because the Commission alternatively concluded that "if any [DHSS] action was required, [DHSS's] approval of the DA–113, which showed precisely where beds were taken out of service, meets that requirement." Having already determined that DHSS formal action was not required,

we need not further lengthen this opinion by addressing those contentions.

### B. Replacement Beds

■ DMS's next claim in Point I is that the Commission erred in finding that the beds in Ray County's new wing were "replacement beds" and that Ray County "failed to comply with documentation requirements for obtaining an increase in Medicaid funds." DMS first argues that the beds in Ray County's new wing do not qualify as "replacement beds" under the definition thereof in the Plan. Ray County, on the other hand, contends that the Commission was correct in finding that they do.

Section (4) of the Plan contains the definitions. Subsection (VV) provides:

> (VV) Replacement beds. Newly constructed beds never certified for Medicaid or previously licensed by the Division of Aging or the Department of Health and put in service in place of existing Medicaid beds. The number of replacement beds being certified for Medicaid shall not exceed the number of beds being replaced.

DMS asserts that the beds in Ray County's new wing do not meet the definition of replacement beds because all of the beds were (a) previously certified for Medicaid and (b) previously licensed by DHSS.

While acceding to the Commission's definition of beds on this appeal, DMS contends that the location of beds is irrelevant to certification because certification is done in the aggregate by facility. It claims that the fact that Ray County's new wing was not approved to house beds certified for participation in the Medicaid program until April 22, 2003, does not mean that the 56 beds placed therein were never certified for Medicaid prior to April 22, 2003. DMS asserts that adding a new wing to the facility simply expands the area where certified beds may be placed to participate in the Medicaid program and that expanding the area in which Medicaid beds can be placed does not impact the number of Medicaid beds in a facility.

At first blush it seems to make sense to say that Ray County had 56 beds in its old wing and the capacity to provide care to 56 patients in those beds, and that, therefore, they were previously certified and licensed. The problem with DMS's argument, however, is that it disregards the other provisions of the definition of replacement beds.

"The same principles of construction are used in interpreting regulations as in interpreting statutes." *Teague,* 127 S.W.3d at 685. In interpreting regulations, our goal is to ascertain the intent from the language used and to give effect to that intent if possible. *Budding,* 19 S.W.3d at 680. In doing so, we give the words used their plain and ordinary meaning. Id. The court must likewise attribute meaning to every word and clause in the regulatory provision. *Be–Mac Transp. Co. v. State Tax Comm'n,* 725 S.W.2d 599, 600 (Mo. banc 1987). And finally, we assume that absurd results were not intended by adoption of the regulation. *Budding,* 19 S.W.3d at 681.

In addition to not being previously certified or licensed, the definition requires that replacement beds be (1) newly constructed beds, (2) that are put in service in place of existing Medicaid beds, and (3) that the number of such beds not exceed the number of beds being replaced. In light of these additional definitional requirements, were we to accept DMS's argument, there could never be a replacement bed. This is so because, even if Ray County's entire facility burned to the ground, and it built new wings to replace what was destroyed, they would not qualify as replacement beds because the same

facility had previously had the same number of beds certified and licensed by DHSS. Thus, even though they would be newly constructed, put in service in place of the beds that had been destroyed, and equal in number to those being replaced, because that facility previously had the same number of certified and licensed beds, according to DMS's argument, it would mean those "beds" (capacity to provide care) had previously been certified and licensed.

We reject DMS's contention. It would render the provisions of the Plan relating to "replacement beds" meaningless, which would clearly be an absurd result. Contrary to DMS's position, the definition of "replacement beds" can be read to give all words and phrases meaning, and with all provisions in harmony.

We parse the definition by its five separate requirements in analyzing Ray County's new wing.

### 1. Newly constructed beds.

The Commission found, and DMS does not dispute, that the 56 beds at issue were "newly constructed." Ray County constructed an addition to its facility in 2003 containing 66 new rooms. Prior to that construction, the addition itself, the rooms contained therein, and the capacity to provide the quality of care did not exist. The 56 beds for which Ray County seeks reimbursement are contained within the new construction. Thus, the beds are newly constructed.

### 2. Beds never certified for Medicaid.

 The Commission found that the 56 beds at issue had never been certified for Medicaid. A bed is certified for participation in Medicaid after it is determined that a skilled nursing facility is in substantial compliance with all federal requirements and is approved to participate in the

Medicaid program. *19 CSR 30–81.010(1)(A)*. Before Medicaid beneficiaries can be placed in a newly-constructed facility or portion thereof, DHSS must inspect the facility and verify that it has met those requirements. Until that approval is given, the beds located within the new construction cannot be used to care for Medicaid beneficiaries.

On February 6, 2003, the County submitted a DA–113 form to DHSS, together with a letter describing its intent to convert its double rooms into single-occupancy rooms. The DA–113 identified the beds placed into service in the newly-constructed addition. The DA–113 also served as a request that all beds within the facility be certified for Medicaid. On April 23, 2003, DHSS approved the requested change.

Until DHSS verified that the newly-constructed rooms met the requirements for participation in Medicaid, the beds were not approved for the provision of care to Medicaid-eligible residents. In other words, the 56 beds at issue were never certified for Medicaid prior to April 23, 2003.

### 3. Beds not previously licensed by DHSS.

As noted *supra,* DMS argues that Ray County had 141 licensed beds prior to construction of its new addition. Fifty-six of those beds were taken out of service when the new wing opened and 56 new rooms in that wing were placed in service to replace them. But Ray County's licensed capacity did not change. Thus, DMS contends that those 56 beds were previously licensed. But once again, if you interpret the definition of replacement bed in that manner, you negate the possibility of a "replacement bed" as contemplated by the Plan ever occurring. We decline to be so cynical as to believe that was the intent

of the drafters. A far more rational analytical approach exists.

Certain construction, fire safety, and physical plant standards must be met before a newly-constructed addition to a facility can be licensed. *19 CSR 30–85.012; 19 CSR 30–85.022; 19 CSR 30–85.032.* First, the construction plans must be approved before the project commences. *19 CSR 30–85.012(3).* Under the CoN law, the facility is subject to periodic inspection during the construction process to ensure that it conforms with the regulations. Once construction is complete, the facility must be inspected before it can be approved for licensure. Because the facility must obtain a CoN before it can be licensed, the facility cannot obtain a license until the final construction has been approved by the DHSS.

Ray County complied with all requirements for licensure and was granted a license to operate the facility and place residents within the newly-constructed addition on April 22, 2003. Prior to that time, Ray County was not licensed to provide care for 56 residents in beds contained in the newly-constructed addition.

Viewed in this manner, and mindful that the meaning of "beds" for purposes of the Plan is as a measure of a facility's capacity to provide care, this has to be the conceptual analysis contemplated by the drafters of the definition of "replacement beds" in the Plan. Accordingly, the 56 beds in Ray County's new wing had not been previously licensed.

## 4. Beds put in service in place of existing Medicaid beds.

This definitional requirement further confirms our interpretation of what is meant by not having previously been certified or licensed. To be a "replacement bed," the replacement must be placed in service in place of a previously existing

Medicaid bed. A previously existing bed must have been certified and licensed in order to be a Medicaid bed. Therefore, according to DMS's argument, since the previously existing Medicaid bed was certified and licensed, a bed put in service in place of it could never be a "replacement bed." Such would be a contradiction in terms.

In this case, Ray County took 56 beds out of service in its old wing and, in place of them, put 56 beds in service in the new wing. The beds were clearly put in service in place of existing Medicaid beds.

## 5. The number of replacement beds shall not exceed the number of beds being replaced.

This requires no discussion. The parties concede that the number of replacement beds did not exceed the number being replaced.

Accordingly, we reject DMS's contention that the 56 beds in Ray County's new wing did not qualify as "replacement beds" under the Plan. To the contrary, they meet the definition of "replacement beds" in the Plan and were properly treated as such by the Commission.

### C. Verification of Delicensure

DMS also argues that Ray County did not provide documentation from DHSS verifying delicensure of the 56 beds in its old wing and did not obtain the appropriate CoN authorizing replacement.

As discussed *supra,* Section (13)(B)6 of the Plan provides, *inter alia:* "The facility shall provide documentation from [DHSS] that verifies the number of beds used for replacement have been delicensed from that facility." DMS contends that Ray County did not provide this documentation.

On February 21, 2003, Ray County submitted to DHSS a DA–113 form, entitled "Bed Classification for Licensure and Certification by Category." It requested licensure for 151 beds and reflected one bed in each of the rooms formerly containing two beds and one bed in each of the newly-constructed rooms. DHSS inspected the facility and issued a letter on April 22, 2003, approving the DA–113 form and enclosing an amended license reflecting the 151 beds. The amended license noted a "10 bed increase effective 4/22/03 (141 + 10 = 151 Beds)."

The DA–113 form submitted to DHSS by Ray County also requested that all beds be certified for participation in Medicaid. The DHSS letter of April 22, 2003, to Ray County approving its DA–113 form also approved the change in certification. DHSS documented the change in certified capacity that same day by issuing a Certification and Transmittal form that was transmitted to DMS reflecting certification of 151 beds.

The Commission found that the DA–113 form Ray County submitted to DHSS showed precisely where beds were taken out of service and their new location. DHSS was required to and did verify the new location of the beds, and it issued an amended license for 151 beds, which included the ten new beds. The Commission found that the verification requirement was satisfied by the DA–113 form, the amended license, and the Certification and Transmittal form documenting the actions, which DHSS transmitted internally to DMS. These findings are amply supported by the record, indeed the documents themselves. The documents submitted by Ray County constitute verification of delicensure as required by § (13)(B)6 of the Plan.

### D. Replacement Certificate of Need

 DMS next asserts that Ray County failed to obtain a CoN authorizing replacement, which it contends is the required variety in order to obtain a rate increase for replacement beds, and that, therefore, DMS is precluded by § 197.315 from increasing Ray County's rate.

This is, at best, a convoluted argument. The crux of it seems to be that § 197.315.5 generally provides that a state agency cannot pay any funds to any health care facility that has not "first obtained every certificate of need required." While that seems simple enough, the argument gets murkier when DMS claims that Ray County did not qualify for or receive a CoN designating the project as one for replacement.

The CoN statutes contain provisions covering specified instances for which a CoN will be granted for the transfer of beds from one licensed facility to another, and there are several references therein to replacement. *See §§ 197.318.8(4), 197.318.9 & 197.318.10.* It is conceded by all involved that Ray County's project did not qualify as a replacement under these statutes or the regulations adopted pursuant thereto. Ray County's new wing did qualify for, and it did receive, a CoN authorizing a renovation/modernization. From these facts, DMS reasons that it is precluded from reimbursing Medicaid funds to Ray County for the beds in the new wing pursuant to § 197.315 because Ray County did not have a CoN for replacement.

 The argument is premised on the notion that Ray County is claiming that the beds in its new wing are "replacement beds" under the Plan, and that, therefore, the new wing must have been treated as a replacement for CoN purposes as well. This contention is wholly without merit and deserving of little comment. Needless to say, the purpose of the CoN laws and regulations and the purpose of the Medic-

aid laws and regulations, including the Plan, are totally different. "The purpose of the certificate of need program is to reduce unnecessary duplication in health care facilities and to reduce the cost of health care." *Community Care Ctrs.*, 735 S.W.2d at 14. The purpose of Medicaid, on the other hand, is as follows:

> Benefit payments for medical assistance shall be made on behalf of those eligible needy persons as defined in section 208.151 who are unable to provide for it in whole or in part, with any payments to be made on the basis of the reasonable cost of the care or reasonable charge for the services as defined and determined by the division of medical services. . . .

§ *208.152.1*. The purpose of the Plan is to establish "a methodology for determination of [Medicaid] reimbursement rates for nursing facilities." § *13 CSR 70–10.015(2)*.

As can be seen, not only do these laws and regulations not share a common purpose, they likewise don't even address a common subject matter. Thus, when the CoN laws and regulations refer to replacement, they are referring to something entirely different than what the Plan provides with respect to "replacement beds." Indeed, the director of MHFRC testified that Ray County did not have to get a replacement CoN for its project and that MHFRC "applied the review of renovation and modernization since these were beds being moved from one part of the facility to another part." Thus, not only is it crystal clear from the statutes and regulations that they are unrelated and independent of each other, there is evidence in the form of the MHFRC director's testimony confirming it. Accordingly, we reject DMS's contention.

### E. Public Policy and Deference to Administrative Agencies

Before moving on to Point II, it is necessary to comment on a couple of additional elements that DMS included in its argument on Point I. In its brief, as a separate subsection of its argument, DMS asserts that the Commission decision granting Ray County a rate increase "violates public policy." It then rehashes the reasons why it claims its position is correct and concludes that a contrary decision violates public policy as embodied in the enabling statutes. Since we have rejected individually the arguments it cumulatively contends represent public policy, we need not address them.

In addition, in at least two instances in its argument on Point I, DMS claims that the Commission erred in failing to give deference to DMS's interpretation of its own regulation, citing *Collins v. Department of Social Services*, 141 S.W.3d 501 (Mo.App. S.D.2004). In *Collins*, while discussing standard of review in administrative cases, the court noted the general standard that when an agency decision involves the interpretation of law and application of the law to undisputed facts, appellate courts reach their own independent conclusions and are not bound by the agency's interpretation. Id. at 504. It then went on to observe that "[s]ome deference, however, is appropriate when the issue involves an agency interpretation of its own regulation." *Id.* In addressing the regulation there under consideration, the court stated that it was giving deference to the agency's interpretation of the word "acreage," and perhaps it did, but that interpretation was based on the dictionary definition. Id. at 505.

We acknowledge that there are cases, primarily from the Eastern and Southern Districts of this court, stating, as does *Collins*, that an agency's interpretation of

its own regulation is entitled to some deference by an appellate court. *See, e.g., State ex rel. Webster v. Missouri Res. Recovery, Inc.,* 825 S.W.2d 916, 931 (Mo. App. S.D.1992); *Willard v. Red Lobster,* 926 S.W.2d 550, 553 (Mo.App. E.D.1996); *Reed v. Missouri Dep't of Soc. Servs., Family Support Div.* 193 S.W.3d 839, 841–42 (Mo.App. E.D.2006). A very cursory review of the pedigree of such statements suggests that the origin might be federal case law, *see Webster,* 825 S.W.2d at 931 (citing *Vermont v. Thomas,* 850 F.2d 99, 102 (2d Cir.1988)), or Missouri cases stating that "[t]he interpretation and construction of a *statute* by an agency charged with its administration is entitled to great weight." *Foremost–McKesson, Inc. v. Davis,* 488 S.W.2d 193, 197 (Mo. banc 1972); *see also Four Rivers Home Health Care, Inc. v. Director of Revenue,* 860 S.W.2d 2, 4 (Mo.App. W.D.1993); *Morton v. Missouri Air Conservation Comm'n,* 944 S.W.2d 231, 236 (Mo.App. S.D.1997). While it is logical to say that a regulation adopted by an agency pursuant to a statute the agency administers *is* the agency's interpretation of that statute, it is not necessarily logical, and we question whether it is sound judicial policy, to say that a court should give deference to the agency's *interpretation* of that regulation. For, as noted *supra,* when interpreting a regulation, a court looks to the words used and gives each its plain and ordinary meaning. *Teague v. Mo. Gaming Comm'n,* 127 S.W.3d 679, 686 (Mo.App. W.D.2003). Thus, it would be inappropriate for a court to defer to an agency's interpretation of its own regulation that was in any way expanding upon, narrowing, or otherwise inconsistent with the plain and ordinary meaning of the words used in the regulation.

But be that as it may, even if it is sound policy and appropriate to do so, DMS is confused in its understanding of the role of the Commission. In *Department of Social Services v. Mellas,* 220 S.W.3d 778 (Mo. App. W.D.2007), DMS made the same argument, asserting that the Commission erred by failing to defer to its specialized knowledge. In *Mellas,* this Court rejected DMS's argument, explaining the role of the Commission in the review process:

> The department's assertion that the commission was obligated to defer to it is incorrect. To the extent that the department is in a better position to determine the gravity of the infractions, its obligation under the scheme for the commission's review devised by the General Assembly is to share its insights with the commission and to persuade the commission of the soundness of its policy.
>
> In Section 621.055, RSMo 2000, the General Assembly mandated that the Commission have the power to review the department's decision. In fulfilling this role, the Commission's decision becomes the decision of the department. *Geriatric Nursing Facility, Inc. v. Department of Social Services,* 693 S.W.2d 206, 210 (Mo.App.1985) (circuit court had subject matter jurisdiction over petition to review decision of Department of Social Services as "adjusted" by Administrative Hearing Commission). "The [commission's] function is to render the administrative decision of the agency." *Department of Social Services v. Administrative Hearing Commission,* 826 S.W.2d 871, 874 (Mo.App.1992). The commission actually steps into the department's shoes and becomes the department in remaking the department's decision. This includes the exercise of any discretion that the department would exercise. *State Board of Registration for the Healing Arts v. Finch,* 514 S.W.2d 608, 614 (Mo.App.1974).

Mellas' case makes obvious the need for the commission's independent, impartial review. The department insists that Mellas alone caused the problems with his billings. It seemingly is unaware that it, not Mellas, was the primary cause. As an independent, objective reviewer of the department's actions, the commission plays a key role in helping Missouri constituents contend with an administrative agency that can be blind to its own faults.

The department counters that *Finch,* cited *supra,* does not apply because "it arose under a different statute granting broader reviewing authority to the Commission, whereas the Commission's jurisdiction in this matter set forth in RSMo Section 621.055 states only that the Commission will 'review' the decision." The department is wrong. The disputes in *Finch* and in this case are governed by the procedures as set forth in Chapter 536. The commission's authority in *Finch,* even arising under a different statute, is the same as the commission's authority to hear the present case.

*Id.* at 782–83.

■ Thus, the Commission need not defer to DMS's interpretation of its own regulation. Rather, the Commission determines the proper interpretation of the agency regulation, and that becomes the agency's interpretation of its regulation. As was the case in *Mellas,* this case emphasizes the need for the *Commission's* independent, impartial review. What DMS is actually complaining of in the instant appeal is the Commission's unwillingness to apply its regulation, the Plan, in the manner DMS wants it to be applied. But DMS's desired application of the Plan is contrary to the Plan's plain language.

4. § 13 CSR 70–10.015.

We do not look beyond the plain and ordinary meaning of the words used by the governing body unless their meaning is ambiguous or would lead to an illogical result defeating the purpose of the legislation. "[I]f the agency's rule is unambiguous on its face, no interpretation is necessary and the court must give effect to the agency's intention as clearly expressed, and even a long standing interpretation should be disregarded when such interpretation conflicts with the clear language of the rules."

*State ex rel. Stewart v. Civil Serv. Comm'n of St. Louis,* 120 S.W.3d 279, 287–88 (Mo. App. E.D.2003) (internal citations deleted). The Commission was not required to give deference to DMS's interpretation of the Plan. Rather, it was required to and did apply the plain language of the Plan, but DMS simply does not like what the Plan says. Point I is denied.

**POINT II.**

■ In Point II, DMS asserts error in the Commission's calculation of Ray County's rate adjustment, claiming that the Commission double-counted 56 beds and incorrectly separated the rate adjustment calculation for additional beds and replacement beds.

As noted *supra,* the Commission determined that the 56 beds in Ray County's new wing that were transferred from the pre-existing portion of its facility were "replacement beds" as provided for in § (13)(B)6 of the Plan,[4] and the ten new beds were "additional beds" as authorized by § (13)(B)7. DMS's claims relate to the calculation of asset value, which is part of the rate adjustment calculation provided for in those sections of the Plan. The wording of the two sections is virtually identical.

Section (13)(B)6 provides, in pertinent part:

The rate adjustment will be calculated as the difference between the capital component per diem (fair rental value (FRV)) prior to the replacement beds being placed in service and the capital component per diem (FRV) including the replacement beds placed in service as calculated in subsection (11)(D) including the replacement beds placed in service. The capital component is calculated for the replacement beds using the asset value per licensed bed as determined using the R.S. Means Construction Index for nursing facility beds adjusted for the Missouri indexes for the date the replacement beds are placed in service.

The relevant portion of § (13)(B)7 states:

The rate adjustment will be calculated as the difference between the capital component per diem (FRV) prior to the additional beds being placed in service and the capital component per diem (FRV) including the additional beds placed as calculated in subsection (11)(D) including the additional beds placed in service. The capital component is calculated for the additional beds using the asset value per licensed bed as determined using the R.S. Means Construction Index for nursing facility beds adjusted for the Missouri indexes for the date the additional beds are placed in service.

Everyone agrees that the plain language of these sections requires measurement of the difference between an earlier value and a later value. As found by the Commission, and not disputed by the parties, the provisions are vague as to whether the phrase "as calculated in subsection (11)(D)" applies to the earlier value, the later value, or both. The parties also agree, and the Commission so found, that the phrase cannot apply to both the earlier and the later value because, if it did, the earlier and later date required by subsection (11)(D) would be the same, the "difference" would always be zero, and no rate adjustment could occur.

To understand why this is so, it is necessary to take account of the language of § (11)(D)1.A of the Plan, which provides in pertinent part as follows:

A. Determine the total asset value;

(I) Determine facility size from the 1992 desk audited and/or field audited cost report;

(II) Determine the number of increased licensed beds after the end of the facility's 1992 desk audited and/or field audited cost report *but prior to July 1, 1994;*

\* \* \*

(IV) Determine the number of decreased licensed beds after the end of the facility's 1992 cost report *but prior to July 1, 1994* [.]

(Emphasis added). Subsection (V) then instructs that the sum of (I), (II), (III), less (IV) multiplied by the asset value is the total asset value. As can be seen, subsection (II) and (IV) both contain the restriction "prior to July 1, 1994." Limiting the number of beds to those before July 1, 1994, by following the explicit terms "prior to July 1, 1994," effectively renders the remainder of the rule meaningless. It would not allow any nursing facility to receive a rate increase for any additional or replacement beds added after July 1, 1994.

 DMS argues that § (11)(D)1.A should be interpreted as if the phrase "prior to July 1, 1994" was not contained therein. In other words, DMS asserts that its interpretation of the Plan is to treat the phrase "prior to July 1, 1994" as

having been completely removed.[5] Ray County contends, and the Commission agreed, that you can't just read the language out of the regulation completely because that effectively amounts to an amendment of the regulation, which can only be done after publication as required by § 536.021. "Section 536.021 sets forth the notice and comment procedures for rulemaking, amending, and rescinding. The purpose of the notice and comment procedures is to provide information to the agency through statements of those in support of or in opposition to the proposed rule." *NME Hosps., Inc. v. Department of Soc. Servs., Div. of Med. Servs.,* 850 S.W.2d 71, 74 (Mo. banc 1993). "A rule adopted in violation of § 536.021 is void." *Id.*

We agree with Ray County and the Commission. Vague or even inept drafting does not permit us to simply read the language out of the regulation. But we agree, as do all involved, that the regulation is ambiguous with the phrase "prior to July 1, 1994" appearing in both subsections A(II) and (IV) of § (11)(D)1. Accordingly, we must resort to our traditional rules of construction since the intent of the drafters cannot be ascertained from the plain language of the regulation. *State ex rel. Angoff v. Wells,* 987 S.W.2d 411, 416 (Mo.App. W.D.1999). When the intent cannot be determined because the language used is ambiguous, the regulation should be given a *reasonable interpretation* and construed in a manner consistent with the provision's objective. Id. at 417.

Sections (13)(B)6 and (13)(B)7 authorize a rate adjustment for replacement beds and additional beds. They are clear that the adjustment is calculated by adding the replacement beds or additional beds to the original capital component per diem calculation and then subtracting the original capital component per diem. Moreover, §§ (13)(B)6 and (13)(B)7 authorize a rate adjustment any time replacement or additional beds are added without any time limitation. The vagueness or ambiguity results from the inclusion of "prior to July 1, 1994" in the provisions of both subsection (11)(D)1.A(II) and (IV). The problem is what value the time frame applies to. The Commission concluded, and we agree, the difficulty can only be resolved, and still give meaning to the words "prior to July 1, 1994," by applying the limitation to the earlier value since §§ (13)(B)6 and (13)(B)7 clearly state that "[t]he rate adjustment will be calculated as the *difference*" between the earlier and later values. (Emphasis added). Accordingly, for purposes of calculating the rate adjustments authorized by §§ (13)(B)6 and (13)(B)7 of the Plan only, the July 1, 1994 time limitation is only applicable to § (11)(D)1.A(IV).

Not only does this interpretation give meaning to the words used, but it also achieves the two overarching goals of statutory construction. First, it is absolutely crystal clear that §§ (13)(B)6 and (13)(B)7 were intended to provide for a rate adjustment when replacement or additional beds are added. This interpretation is consistent with the regulation's objective because it allows a rate adjustment to be calculated by finding the difference between an earlier value and a later value, as opposed to that objective being frustrated and the entire provision rendered meaningless. Secondly, it is a fundamental tenet of statutory construction that "[w]here one provision of a [regulation] contains general language and another provision in the same [regulation] contains more specific language, the general language should give

---

5. Of course, it also contends that the Commission and this court should defer to its inter-

pretation. We have addressed that contention *supra.*

way to the specific." *Younger v. Missouri Pub. Entity Risk Mgmt. Fund,* 957 S.W.2d 332, 336 (Mo.App. W.D.1997). The provisions of § (11)(D)1 are the general provisions for calculation of the capital component in all rates. On the other hand, §§ (13)(B)6 and (13)(B)7 specifically provide for a rate adjustment any time replacement or additional beds are added and are not limited as to time. Accordingly, the interpretation we adopt requires the general language of § (11)(D)1 to give way to the specific direction of §§ (13)(B)6 and (13)(B)7.

With this interpretation in mind, we now turn to DMS's first contention, that the Commission double-counted 56 beds in its calculation of Ray County's rate increase. To understand DMS's argument, we must once again refer back to § (13)(B)6. It provides that the rate adjustment is the difference between "the capital component per diem ... *prior to the replacement beds being placed in service* and the capital component per diem ... *including the replacement beds placed in service as calculated in subsection (11)(D) including the replacement beds placed in service.*" DMS argues that the Commission, in calculating the post-replacement capital cost per diem, started with the number of beds in 1992, 141, and added the ten additional beds and 56 replacement beds for a total of 207 beds. DMS complains that this was error since the 56 replacement beds were replacing 56 beds taken out of service. It contends the calculation should have started with 85 beds in 1992, which is the original 141 beds minus the 56 later taken out of service, and then added the ten additional and 56 replacement beds, for a total of 151 to calculate the post replacement capital cost per diem.

DMS's reasoning is misguided at best. It is not even consistent with its own interpretation of § (11)(D)1.A(II) and (IV), which we have already rejected. It is essential to add the cost of the replacement beds to the original cost minus the facility age reduction value in order to find the *"difference"* between the post-replacement capital cost per diem and the pre-replacement capital cost per diem as required by § (13)(B)6 of the Plan. And it only makes sense to do so, because Ray County still has a cost component in its operating costs equal to the undepreciated value in the original cost of the replaced beds. Thus, in simplest terms, you take the asset value of the original 141 beds, subtract for depreciation (facility age reduction), add the asset value of the additional beds and replacement beds and, applying the formula in the Plan, thereby come up with the capital cost per diem including the replacement beds. You then subtract the capital cost per diem prior to the replacement from the capital cost per diem including the replacement beds to come up with the rate adjustment. The Commission did not double count beds or err in its calculation of the rate adjustment for replacement beds.

DMS's final contention is that the Commission erred by calculating the rate adjustment for additional beds and replacement beds separately, and then adding the two adjustments together. It claims that there is no need to calculate them separately and that doing so "artificially increases the facility's rate by counting certain variables twice in the per diem rate calculation." But DMS offers no explanation of what variables are counted twice,[6] nor does it even suggest that there is anything in the Plan that requires that the two rate adjustments should be calcu-

6. Indeed, the Commission found that Ray County demonstrated that DMS's "calculation of the increases together artificially depresses the increase for replacement beds."

lated together. Rather, DMS again offers the lame excuse that the Commission should have deferred to its interpretation.

The Commission noted that the Plan identifies rate adjustments for additional beds and replacement beds as separate and distinct adjustments. One is provided for in § (13)(B)6 and the other in § (13)(B)7. Therefore, it concluded that the only reasonable interpretation of the Plan was to calculate them separately. We agree. First, there is absolutely nothing in the Plan to even remotely suggest that the two rate adjustments should be calculated together. And secondly, they are separate and distinct adjustments in the Plan. They are authorized by separate subsections of the Plan. Under such circumstances, it would be error to combine them. Point denied.

The Commission's decision is affirmed in all respects.

All concur.