NUMBER 13-09-186-CV



# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

| | |
|---|---|
| DOMINION OKLAHOMA TEXAS EXPLORATION<br>AND PRODUCTION, INC., | Appellant, |
| **v.** | |
| FAULCONER ENERGY CORPORATION, ET AL., | Appellees. |

---

### On appeal from the 389th District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Vela
### Memorandum Opinion by Justice Vela

This is an appeal from a trial court judgment awarding appellees, Faulconer Energy Joint Venture 1988 ("FEJV88"), Faulconer Energy Corporation ("FEC") and Vernon E. Faulconer, Inc. ("VFI") (collectively, appellees will be referred to as, "Faulconer," unless the specific argument or issue requires us to further delineate the specific party),

$2,167,342.33 from appellant, Dominion Oklahoma Texas Exploration and Production, Inc. ("Dominion"). By three issues, Dominion argues that: (1) the trial court erred in awarding Faulconer amounts that were paid by Bituminous Insurance Company, Faulconer's insurer, because Bituminous was not a party in the underlying case; (2) the trial court erred in holding that Dominion agreed to indemnify Faulconer from the consequences of its own negligence because the indemnity provisions at issue fail to satisfy the fair notice requirements under Texas law; and (3) the trial court erred in holding that there was no agreement between Faulconer and Dominion to settle the Ayala litigation because the parties came to an agreement on all of the essential terms of the joint settlement. By one cross-issue, Faulconer urges that the trial court erred in miscalculating the amount of prejudgment interest because the trial court used the filing of this lawsuit as the accrual date, rather than a notice of claim that was filed in a previous case that had been settled. We affirm.

## I. BACKGROUND

This suit arises from an assignment of mineral interests and related indemnity agreements. Dominion alleged that Faulconer breached an agreement related to settlement of litigation brought by third parties (referred to in the opinion as the "Ayala litigation") that related to the interest assigned.[1] Dominion is engaged in the business of exploring and producing oil, gas and other minerals. It is the successor in interest to Louis Dreyfus Natural Gas Corporation and American Exploration Company ("American").

---

[1]The Ayala litigation was brought by a group of plaintiffs who claimed that their property was damaged by pollution caused by leaking natural gas pipe lines. One of the Faulconer entities operated the pipeline from 1989 to 1993. Dominion was the previous owner of the same pipeline for two years. The Ayala case was styled in the trial court as cause no. C-4597-92-C; *Eva Reyna Ayala, et al v. Phillips Properties, Inc., et al.*

2

Faulconer is also engaged in the same business.

In transactions occurring between 1987 and 1989, Faulconer bought from Fina and another company called Fair Operating Company, a system of five gas well and gathering lines and connecting pipes. In September 1993, FEJV88 (the Faulconer joint venture) and American entered into a purchase and sale agreement and an assignment and bill of sale to sell what had previously been acquired from Fina and Fair.[2] There were indemnity agreements that were part of both documents, and the enforceability of those agreements is at issue in this appeal.

Two years after the sale to Dominion, various lawsuits, including the Ayala litigation, were filed by plaintiffs claiming damages pertaining to leaking pipelines. In 1998, Faulconer filed suit against Dominion asking for indemnity and a defense in the litigation. Faulconer urged that indemnity and a defense were owed based upon the 1993 purchase and sale agreement and the assignment and bill of sale. In 1999, the lawsuit between Faulconer and American (Dominion's predecessor) settled. American reserved the right to deny indemnity and agreed to provide a defense to all of the Faulconer entities.[3]

In 2000, a case similar to the Ayala case went to trial in Hidalgo County that resulted in a $100 million verdict for the plaintiffs in that case against another oil company. In October 2002, Fina sued Faulconer for in excess of the $1.8 million it had incurred in defending and settling in the Ayala litigation. Tom Markel, a vice president for Faulconer,

---

[2]American eventually merged with Louis Dreyfus Natural Gas and American ceased to exist. There was another merger and the resulting entity is Dominion, the appellant herein.

[3]In 2001, several hundred additional plaintiffs intervened in the lawsuits involving the pipelines. Fina and Faulconer had previously entered into an indemnity agreement in 1989. In 2002, Fina was sued and settled with sixty-five plaintiffs for $250,000. Fina was later brought back in to the litigation. This indemnity obligation becomes important with respect to the later negotiations between Faulconer and Dominion.

3

testified that this was a significant lawsuit to Faulconer.  Prior to November 2005, counsel for Faulconer became concerned and wrote a letter to Larkin Eakin, counsel for Dominion, urging that Dominion should contribute to the settlement of the Ayala litigation because the venue was bad and a large judgment could be predicted if the Ayala case went to trial.

In November 2005, Dominion and Faulconer had a meeting regarding a possible joint settlement of the Ayala litigation. The evidence at trial was conflicting with respect to whether Faulconer's concern about including Fina in any proposed settlement was discussed.  Several witnesses testified on behalf of Dominion suggesting that Faulconer had never mentioned that it needed to be indemnified against any claim by Fina before agreeing to settle.  Conversely, witnesses for Faulconer testified that it was not willing to settle the Ayala litigation if Fina was not included and that Dominion knew that it was important to Faulconer.  The parties unsuccessfully mediated the Ayala litigation in December 2005.  The parties also learned in December that there would be no release from Fina.

In January 2006, Joe Luce, an attorney, began negotiating with the Ayala plaintiffs on behalf of Dominion. In late January 2006, Luce determined that he could settle the Ayala litigation for $12 million.  Before the settlement occurred, emails were exchanged between Luce and counsel for Faulconer.  In one email, sent on January 12, 2006, counsel for Faulconer outlined the amount and percentages of the settlement that Faulconer would agree to pay toward settling the Ayala litigation. Again, Dominion and Faulconer dispute whether the claims of Fina were included at this time.  Because Faulconer would not agree to settle without a release from Fina, Dominion settled with the Ayala plaintiffs without Faulconer's participation.  At that time, Dominion also stopped funding Faulconer's

4

defense.  Thereafter, the plaintiffs settled with Fina, and Faulconer settled with the Ayalas for $1.5 million.

On May 19, 2006, Dominion sued Faulconer seeking declaratory relief that it had no duty to provide a defense to Faulconer after March 2, 2006, or to indemnify Faulconer for any judgment in the Ayala lawsuit.  Dominion also sought damages against Faulconer, alleging that they had beached the agreement to settle the Ayala lawsuit.  Faulconer counterclaimed, alleging that Dominion breached its obligation to indemnify Faulconer from the costs of defending and settling the Ayala litigation.

Trial was to the court. Judgment was entered on January 13, 2009, in favor of Faulconer awarding the sum of $2,167,342.33, which consisted of litigation costs in the amount of $661,601.41 in connection with the filing of the Ayala litigation, and litigation costs of $5,740.92 in connection with defending the Fina case.[4]  The trial court also awarded Faulconer $1.5 million, representing the cost of settling the Ayala litigation and prejudgment interest on the total amount of the judgment at five percent per annum from May 19, 2006, until the date of judgment.  This appeal ensued.

## II.  Standard of Review

In an appeal from a bench trial, the trial court's findings of fact "have the same force and dignity as the jury's verdict upon questions."  *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex. 1991); *see Ashcraft v. Lookadoo,* 952 S.W.2d 907, 910 (Tex. App.–Dallas 1997, writ denied) (en banc).  The trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence to support them by the same standards that

---

[4]The Fina litigation was styled trial court cause no. C-2000-02-F; *TotalFinaElf E&P USA, Inc. and ATOFINA Petrochemicals, Inc. v. Vernon E. Faulconer, Inc.*

are applied in reviewing evidence supporting a jury's answers. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Anderson,* 806 S.W.2d at 794. Fact findings, however, are not conclusive when, as in this case, a complete reporter's record appears in the record. *City of Corpus Christi v. Taylor*, 126 S.W.3d 712, 717 (Tex. App.–Corpus Christi 2004, pet. dism'd) (citing *Tucker v. Tucker,* 908 S.W.2d 530, 532 (Tex. App.–San Antonio 1995, writ denied)); *see Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex. App.–Houston [14th Dist.] 1985, writ ref'd n.r.e.). Unchallenged findings of fact are binding on an appellate court unless the contrary is established as a "matter of law" or there is "no evidence" to support the finding. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex. 1986). Generally, attacks on the sufficiency of the evidence supporting findings of fact "must be directed at specific findings of fact, rather than at the judgment as a whole." *Arrellano v. State Farm Fire & Cas. Co.,* 191 S.W.3d 852, 855 (Tex. App.–Houston [14th Dist.] 2006, no pet.) (citing *Zagorski v. Zagorski,* 116 S.W.3d 309, 319 (Tex. App.–Houston [14th Dist.] 2003, pet. denied)).

A finding is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). A legal sufficiency challenge may only be sustained when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex. 1998). In evaluating the evidence's legal sufficiency, "we credit

evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller,* 168 S.W.3d at 827); *see Am. Interstate Ins. Co. v. Hinson,* 172 S.W.3d 108, 114 (Tex. App.–Beaumont 2005, pet. denied). The trial court, as fact-finder, determines the credibility of the witnesses and the weight to be given their testimony. *See City of Keller,* 168 S.W.3d at 819; *McGalliard,* 722 S.W.2d at 697. Furthermore, in reviewing the sufficiency of the evidence, we may not substitute our own judgment for that of the trier of fact, even if we would reach a different conclusion on the evidence. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998).

In conducting a factual sufficiency review, we consider and weigh all of the evidence and set aside the verdict and remand the cause for a new trial, if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some "evidence of probative force" in support of the verdict. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761-62 (Tex. 2003). The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict. *Id.*

A party may not challenge conclusions of law for factual sufficiency, but we may review conclusions of law to determine their correctness based upon the facts. *Citizens Nat'l Bank v. City of Rhome,* 201 S.W.3d 254, 256 (Tex. App.–Fort Worth 2006, no pet.). We will uphold a conclusion of law if the judgment can be supported on any legal theory supported by the evidence. *Tex. Dep't of Pub. Safety v. Stockton,* 53 S.W.3d 421, 423 (Tex. App.–San Antonio 2001, pet. denied). We review conclusions of law de novo, *see*

7

*State v. Heal,* 917 S.W.2d 6, 9 (Tex. 1996), and we will not reverse them unless they are erroneous as a matter of law.  *Stockton,* 53 S.W.3d at 423.

### III.  Subrogation Issue

#### A. Background

By its first issue, Dominion urges that the trial court erred in awarding Faulconer damages that were paid by Bituminous, its insured, and were not incurred by Faulconer. The trial court found that Faulconer incurred costs of $1,500,000 to settle the Ayala litigation.  The trial court also filed additional findings of fact that Bituminous paid $389,239.89 of the $661,601.41 of the costs of defending Faulconer in the underlying lawsuit and it paid $500,000 of the $1,500,000 of the costs of settling the claims against Faulconer in the underlying suit.  Dominion argues that the only way Faulconer would be entitled to recover that amount would be if Bituminous had assigned its subrogation rights to Faulconer.  Conversely, Faulconer argues that an insured may bring a subrogated claim of the insurer in its own name, and the insurer is not required to be a party to the suit.

#### B.  Analysis

Dominion argues that the case must be reversed because Bituminous was a necessary party to this litigation.  It relies on *Thoreson v. Thompson* as authority for its position that Bituminous was a necessary party.  431 S.W.2d 341, 347 (Tex. 1968).  In *Thompson*, the supreme court held that the trial court improperly overruled a plea in abatement because the plaintiff's insurer had not been joined.  Thompson, the defendant, filed a plea in abatement for failure to join the insurance company as a party.  *Id*. at 346. The *Thompson* court reasoned that the insurer was a necessary party and became a pro

8

tanto owner of the cause of action. *Id.* at 347. Nothing in the record in *Thompson* showed the insurance company had notice of the suit nor did the judgment provide for any recovery by the insurance company. *Id.*

Here, no party filed a plea in abatement to join Bituminous. And, there is no complaint or pleading filed by Dominion urging that Bituminous was a necessary party and was required to be joined. Also, it is clear in this record, unlike in *Thompson*, that Bituminous understood that its interests were being managed in the lawsuit. In December 2007, Faulconer filed a document in the trial court titled "Statement Regarding Bituminous Insurance Companies." Attached was a letter from counsel for Bituminous to counsel for Faulconer, stating that the "interests of Bituminous Insurance Companies are being protected in the pending litigation referenced above by the Faulconer entities. . . . Thus, Bituminous is not going to file a separate action against Dominion Oklahoma Texas Exploration & Production, Inc. to recover attorney's fees or indemnity benefits paid under its insurance contract with Faulconer entities." The record also reflects that Dominion had previously received a copy of the $500,000 settlement check issued by Bituminous and payable to counsel for the Ayala plaintiffs. Thus, unlike the *Thompson* case, all parties were aware that Bituminous was the insurer and of Bituminous's position that it was protected by the lawsuit. Dominion was aware in advance of the trial in this case that Bituminous had paid a portion of the funds to settle the Ayala claims.

Here, it appears that both Bituminous and its insured, Faulconer, believed that its interest was being protected by Faulconer and that Bituminous had notice that the suit was proceeding in its absence. Therefore, *Thompson* is factually distinguishable.

9

Dominion also relies on *Trans-State Pavers, Inc. v. Haynes*, for the proposition that an insured cannot assert the subrogation rights of its insurer without placing the opposing party on notice of the subrogation claims and making the insurance company a party. 808 S.W.2d 727, 736 (Tex. App.–Beaumont 1991, writ denied). In *Haynes*, the trial court allowed the insureds, who were the plaintiffs, to file a post-judgment trial amendment adding the insurer as a party plaintiff. *Id*. at 729. The defendants objected, contending that at no time did it receive notice before judgment that the court had granted leave to file the trial amendments. *Id*. The court pointed out that appellant in that case was facing a judgment in favor of a party who was added to the case after verdict and judgment and had never been served with citation. *Id*. at 734. Here, there is no similar argument. The crux of Dominion's argument is that Faulconer will receive a double recovery in this case because part of its damages have already been paid by Bituminous. There is no argument or suggestion, however, that Bituminous will look to Dominion for any sort of redress. In fact, it appears to be the opposite. *Haynes* is also distinguishable because there was no showing in that case that the insurer knew about the suit. Here, there was evidence that Bituminous knew about the lawsuit.

Dominion further argues that we should not consider Faulconer's notice regarding the Bituminous entities because it was not formally introduced at trial. We note that it was filed in the trial court during trial and is included as part of the clerk's record in this Court. The letter was also presented to the trial court during the course of the trial. Regardless, the trial court may take judicial notice of its own file documents even though no request is made to do so and no formal announcement is made. *Alford v. Johnston*, 224 S.W.3d

10

291, 300 (Tex. App.–El Paso 2005, pet. denied).  The trial court did not err in considering the letter.

In analyzing the issue before us, we look to the possible prejudice that could result from this case proceeding to trial in the posture that it did.  *See Fort Worth & Denver Ry. Co. v. Ferguson*, 261 S.W.2d 874, 879 (Tex. App.–Fort Worth 1953, writ dism'd).  Here, Dominion had notice well in advance of the trial that Bituminous had paid a portion of the settlement.  In a situation where a party is on actual notice that a third party owns all or a portion of a cause of action, a defendant is under a duty to either protect the interest of the third party in the manner the case is pleaded or the defendant "is under the duty to protect himself from such party by properly raising the issue as to plaintiff's right to sue in the capacity in which he does sue . . . ."  *Id.* at 879.  "If he does neither, then he could not complain of any exposure to further litigation from the third party subrogee-assignee. "  *Id*. There was proof before the trial court that Bituminous will not file a claim against Dominion, as well as proof that Bituminous's interests were protected by the lawsuit.

To reverse this case in the face of Bituminous's agreement that it is protected by Faulconer's participation in this lawsuit would not make sense.  Even Dominion's prayer for relief with respect to this issue is nebulous with regard to how this Court would proceed if it determined that reversal was the correct disposition of this issue.  Dominion prays that we "reverse the trial court's judgment awarding Faulconer over $2.1 million, over $839,000 of that amount belonged to Bituminous, not Faulconer."  But, Dominion does not suggest whether rendition, remittitur of the amount paid by Bituminous, or remand to require the joinder of Bituminous would be proper.  Under the record here, both Dominion and Bituminous are protected.  And, because of the specific facts presented, the appearance

11

of Bituminous as a party was not necessary.  We overrule issue one.

## IV.  Indemnification Claim

### A.  Background Facts

Dominion contends by its second issue that the trial court erred in finding that Dominion agreed to indemnify Faulconer from the consequences of its own negligence because the indemnity provision at issue fails to satisfy the fair notice requirements under Texas law.  Faulconer claims that Dominion's indemnity obligation extended to damages caused by Faulconer's negligence.  Faulconer also argues that the express negligence rule, and the fair notice doctrine do not apply to this case.  In other words, Faulconer claims that actual knowledge of the indemnity provision eliminated any need for "conspicuous" language.

The indemnity provisions at issue were included in a purchase and sale agreement and assignment and bill of sale entered into by Faulconer and American.[5]  In 1993, Faulconer entered into an agreement with American under which Faulconer conveyed property to American.  The agreement included a purchase and sale agreement and an assignment and bill of sale that was included as an attachment to the purchase and sale agreement and was also a separately executed contract.  Both documents contain indemnity agreements—it is the sufficiency of those agreements that is at issue here.

The purchase and sale agreement provides, in pertinent part:

> 7.  <u>Assumption and Indemnity</u>.  At the closing date, Buyer agrees to assume and will pay, perform and discharge all obligations of Seller to the

---

[5]As noted in the factual background in this opinion, American Exploration Company was Dominion's predecessor in interest.

extent such obligations are attributable to Seller's interests in the property and are attributable to periods from and after the Effective Date. Buyer assumes the obligations set forth in the Assignment and Bill of Sale as attached hereto as exhibit "B", . . . and Buyer agrees to indemnify, defend and hold Seller, its successors and assigns, and their respective affiliates, directors, officers, employees, stockholders, partners and agents harmless from and against any and all loss, liability, liens, demands, judgments, suits and claims of any kind or character resulting from such assumed obligations or relating thereto. Buyer agrees to defend any suits brought against Seller on account for any such claims and to pay any judgment against Seller resulting from any such suits, along with all costs and expenses relative to such claims, including attorney's fees.

Except as assumed by Buyer in the foregoing paragraph and in the Assignment and Bill of Sale attached hereto as exhibit "B", Seller shall indemnify and hold harmless buyer, its successors and assigns, and their respective affiliates, directors, officers, employees, stockholders, partners and agents, from and against any and all loss, liability, liens, demands, judgments, suits and claims of any kind or character arising out of, in connection with, or resulting from Seller's operation of the Property, for periods prior to the Effective Date. Seller agreed to defend any suits brought against Buyer on account of any such claims and to pay any judgments against Buyer resulting from any such suits, along with all costs and expenses relative to such claims, including attorney's fees.

The assignment and bill of sale provided, with respect to indemnity:

(b) Assignee shall defend, indemnify and hold Assignor harmless from any and all claims in favor of any person, business or governmental entity for personal injury, death or damage to property or to the environment, or for any other relief arising directly or indirectly from, or incident to, the use, occupation, operation, maintenance or abandonment of any of the Interests, or condition of the property or premises, whether latent or patent, and (INCLUDING WITHOUT LIMITATION THOSE ARISING FROM OR CONTRIBUTED TO BY THE NEGLIGENCE IN ANY FORM OF ASSIGNOR, ITS AGENTS, EMPLOYEES OR CONTRACTORS, INCLUDING SOLE NEGLIGENCE, SIMPLE NEGLIGENCE, CONCURRENT NEGLIGENCE, ACTIVE NEGLIGENCE, PASSIVE NEGLIGENCE, GROSS NEGLIGENCE, STRICT LIABILITY OR WILLFULL CONDUCT OF SUCH PERSONS AND ASSERTED AGAINST ASSIGNEE AND/OR ASSIGNOR AFTER THE EFFECTIVE DATE,) provided that as to any claims made prior to the Effective Date, this paragraph shall not apply.

The trial court made the following findings applicable to the indemnity issue:

13. The intent of DOTEPI's[6] predecessor to indemnify the Faulconer entities for the consequences of their own negligence is specifically stated in the Purchase and Sale Agreement and the Assignment and Bill of Sale between Faulconer Energy Joint Venture 1988 and DOTEPI's predecessor.

14. The indemnity provisions contained in the Purchase and Sale Agreement and the Assignment and Bill of Sale between Faulconer Energy Joint Venture 1988 and DOTEPI's predecessor are written so as to attract the attention of a reasonable person to them.

15. Faulconer Energy Corporation, Vernon E. Faulconer, Inc. and Faulconer Energy Joint Venture, 1988 are all affiliates of each other.

17. Both parties to the Purchase and Sale Agreement and Assignment and Bill of Sale had actual knowledge of the provisions of such contracts, including the indemnity provisions and provisions requiring DOTEPI's predecessor to indemnify the Faulconer Entities from the consequences of the negligence of the Faulconer Entities.

The trial court also filed the following relevant conclusions of law:

1. The Purchase and Sale Agreement and the Assignment and Bill of Sale between Faulconer Energy Joint Venture 1988 and DOTEPI's predecessor require DOTEPI to indemnify the Faulconer entities from the cost of defending and settling the claims against the Faulconer Entities in the Ayala Litigation and Cause No. C-4570-905-F; *First National Bank et. al. v. Phillips Properties, Inc., et. al.*, and Cause No. C-04568-95-D; *Timely Adventures, Inc. v. Difco, Inc, et. al.*, and Cause No. C-04566-95-B; *Ernesto Garza et. al. v. Phillips Properties, Inc. et. al.*, which were subsequently consolidated into the Ayala litigation and Fina litigation.

2. The Purchase and Sale Agreement and the Assignment and Bill of Sale between Faulconer Energy Joint Venture 1988 and DOTEPI's predecessor satisfy the fair notice requirements of express negligence and conspicuousness.

3. Even if the fair notice requirements of express negligence and conspicuousness had not been satisfied by the Purchase and Sale Agreement and Assignment and Bill of Sale, the indemnity provisions are nevertheless enforceable because all contracting parties had knowledge of

---

[6]The parties often refer to Dominion as DOTEPI.

14

such terms.

Dominion argues that the indemnity provision must comply with the express negligence, conspicuousness and fair notice requirements. Faulconer claims that: (1) the express negligence rule and related requirements do not apply to the agreements at issue; (2) actual knowledge negates fair notice requirements; (3) the fair notice test does not apply because the indemnity agreements do not relate to future negligence by Faulconer; and (4) the indemnity portion of the agreement is conspicuous.

## B. Analysis

A contract that fails to satisfy either of the fair notice requirements when imposed is unenforceable as a matter of law. *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2003). One fair notice requirement, the express negligence doctrine, requires that the intent of the parties be specifically stated within the four corners of the document. *Id.* The other requirement, conspicuousness, requires that something appear on the face of the contract to attract the attention of the person looking at it. *Id*. Language may satisfy the conspicuousness requirement by appearing in larger type, contrasting colors, or otherwise calling attention to itself. *Id*. If both contracting parties have actual knowledge of the terms, an agreement may be enforced even if the fair notice requirements are not satisfied. *Id*. Actual knowledge is treated as an affirmative defense to a claim of lack of fair notice. *U.S. Rentals, Inc. v. Mundy Serv. Corp.,* 901 S.W.2d 789, 793 (Tex. App.–Houston [14th Dist.] 1995, writ denied) (op. on reh'g). The burden of establishing actual knowledge is on the party seeking indemnification. *Mo. Pac. R.R. Co. v. Lely Dev. Corp.,* 86 S.W.3d 787, 791 (Tex. App.–Austin 2002, pet. dism'd).

Whether an agreement meets the conspicuousness requirement is a question of law for the trial court. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 509 (Tex. 1993). Indemnity agreements are construed under the normal rules of contract construction. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). The primary goal is to determine the parties' intent. *Id.*

## C. Underlying Facts

Here, the headings in the Purchase and Sale agreement were underlined. The indemnity agreement was in a separately numbered paragraph that was titled "Assumption and Indemnity." It was underlined. The Purchase and Sale agreement made reference to the Assignment and Bill of Sale and it was attached to the purchase and sale agreement as "Exhibit B". In the Assignment and Bill of Sale, paragraph B includes language discussing indemnity set off in all capital letters. The assignment and bill of sale was specifically referenced in the purchase and sale agreement and was also a separately executed document. The trial court did not err in finding that the indemnity provisions were written to attract the attention of a reasonable person and, thus, satisfy the requirements of express negligence and conspicuousness.

Regardless, there was additional evidence that indemnity provisions like the ones at issue here are common in the oil and gas industry. Malcolm Johns, former counsel for Dominion, testified that it is very common to have indemnity provisions in such contracts. Jean Crawley, vice-president for Faulconer stated that indemnity provisions, such as the one at issue here, were standard. Johns also said that it would be general practice in the industry to read and understand the contracts before executing them. Here, both parties

initialed various parts of the agreements, showing that they were reviewed and considered.

The trial court could have considered that the evidence showed knowledge of the indemnity agreements. The parties here were sophisticated business people who were accustomed to indemnity agreements, such as the one at issue here. The trial court could have reasonably concluded from the evidence before it that the parties had actual knowledge. Its findings of fact and conclusions of law are supported by sufficient evidence.

Dominion also argues that indemnity is not owed to any Faulconer entity except FEJV88.[7] Tom Markel, the vice president and chief financial officer for Vernon E. Faulconer, testified regarding the three Faulconer entities. He said that FEJV88 is a Texas partnership. Faulconer Energy Corporation was an eighty-percent owner of the partnership. It was the entity that owned the working interest in the pipeline system at issue in the Ayala litigation. The operating company was Vernon E. Faulconer, Inc., with Vernon Faulconer as the sole stockholder. Under the Assignment and Bill of Sale, Dominion's predecessor agreed to indemnify for those claims "arising from or contributed to by the negligence in any form of assignor, its agents, employees or contractors, including sole negligence, simple negligence, concurrent negligence, active negligence, passive negligence, gross negligence, strict liability or willful conduct of such persons and asserted against assignee and/or assignor after the effective date . . . ." Further, Dominions's predecessor agreed to "indemnify, defend and hold Seller, its successors and assigns and their respective affiliates, directors, officers, employees, stockholders, partners and agents harmless from and against any and all loss, liability, liens, demands,

---

[7]This entity was the joint venture that actually entered into the agreement.

17

judgments, suits and claims of any kind or character arising from such assumed obligations or relating thereto."

The trial court found that Faulconer Energy Corporation, Vernon E. Faulconer, Inc. and Faulconer Energy Joint Venture, 1988 are all affiliates of each other. Dominion has not challenged this finding on appeal. An unchallenged fact finding is binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d at 696. Here, there was evidence to support the trial court's finding and the contrary was not established by Dominion as a matter of law. The trial court did not err in determining that the indemnity agreement included negligence on the part of any of the Faulconer entities. We overrule Dominion's second issue.

## V. Was there an Enforceable Settlement Agreement?

By Dominion's third issue, it asserts that the trial court erred in holding there was no agreement between it and Faulconer to settle the Ayala litigation because the parties came to an agreement on all the essential terms of the joint settlement of the Ayala litigation. Faulconer claims that it made Dominion aware, that in order to settle the Ayala litigation, the indemnity issues of Fina had to be resolved. Dominion argues that Faulconer's authority to settle was verbally conferred by Charles Murray, Faulconer's counsel. On January 12, 2006, Murray sent an email to Joe Luce, who was handling the settlement negotiations for Dominion in the Ayala litigation. The email stated: "Joe, the authority we gave when the $15 million mediator's proposal was being considered was 13% of the first $8 mil, 10% of the next $3 mil, and 3% thereafter up to $15 mil. You still have that authority. Good luck." On the same day, Luce responded to the email as follows: "Thank

you for the confirmation. I will let you know what we decide." Counsel for Faulconer sent additional email correspondence to Luce on January 17, 2006, affirming that the settlement had to include Fina. Dominion claims that the foregoing initial email correspondence of January 12, 2006, was a valid contractual agreement to settle. The trial court made a finding that Faulconer offered to contribute to Dominion's proposed settlement fund for the Ayala litigation contingent upon receiving a release from Fina.

There was conflicting evidence before the trial court. Luce testified that during negotiations in December of 2005, no one mentioned contractual indemnities owed to Fina. According to Luce, as of January 30, 2006, he had not heard anything with respect to indemnity owed to Fina. He claimed that he first learned that Faulconer had agreed to indemnify Fina on February 2, 2006. Luce stated that Fina was not discussed at a November 2005 meeting when the defendants in the Ayala litigation met to discuss settlement of the Ayala litigation. Gilbert Hinojosa, Dominion's expert, testified that Fina was only mentioned at the end.

James Dyer, counsel for Faulconer, testified that he recommended to his client that it not settle unless the agreement included Fina. He stated that during the November 2005 meeting with the defendants in the Ayala litigation, he discussed the necessity of Fina being settled at the same time as everything else. Markel, Faulconer's, vice-president, testified that at the November 2005 meeting, two of Faulconer's attorneys urged that it should not settle without Fina. He also said that "we laid out the formula and details about Fina to them (Dominion) at that time." Jean Crawley, vice-president of land and administration for Faulconer also testified that at least after November 22, 2005, Fina had to be included in any settlement. She said that at that meeting it was made clear to

19

Dominion that Faulconer agreed to pay a portion of the settlement in the event that Faulconer could settle its claims with Fina.

## B. Relevant Law

Texas Rule of Civil Procedure 11 prohibits enforcement of any agreement unless it is in writing. TEX. R. CIV. P. 11. In order to satisfy rule 11, the writing must contain all of the essential elements of the agreement. *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995).

Dominion urges that as a matter of law the email correspondence between Luce and Murray on January 12, 2006, constitutes a binding agreement which set forth the essential terms of the agreement. It argues that it was only after the plaintiffs accepted the settlement offer that Faulconer decided that Fina had to be part of the settlement. There was evidence that the inclusion of Fina as part of the settlement offer was discussed in November 2005. The email sent by Luce refers to an agreement by Faulconer to participate. It does not state what Faulconer was getting in return by way of release. It does not specify whether it is only a release from the Ayala claims or from both the Ayala and Fina claims.

There was evidence before the trial court that a release from Fina had been previously discussed. The trial court could have chosen to believe that testimony. The email correspondence between Luce and Murray does not mention releases at all. The trial court could correctly have determined that all of the essential terms had not been reduced to writing and the rule 11 agreement was not an enforceable contract. *See Padilla*, 907 S.W.2d at 460. We overrule issue three.

20

## VI. Cross Appeal

### A. Background

Faulconer contends by cross-appeal that the trial court incorrectly determined that prejudgment interest began to run in May 2006. It claims that prejudgment interest should have begun to accrue 180 days after it gave notice of its indemnity claim on April 15, 1996. Dominion asserts that Faulconer has completely ignored the fact that the 1996 notice of claim was made prior to and resulted in a 1998 lawsuit, filed in federal court, that was later settled and dismissed.

The trial court awarded Faulconer $2,167,342.33 in this case. With respect to prejudgment interest, the trial court found "in March of 2006 DOTEPI and Faulconer exchanged letters concerning the continuation of DOTEPI providing a defense for Faulconer in the lawsuit. Notice that DOTEPI failed to continue defending was given March of 2006." The trial court concluded that Faulconer was entitled to prejudgment interest beginning May 19, 2006, the day the lawsuit was filed.

### B. Standard of Review and Applicable Law

The trial court's prejudgment interest award is reviewed under an abuse of discretion standard. *See Wilmer-Hutchins Indep. Sch. Dist. v. Smiley,* 97 S.W.3d 702, 706 (Tex. App.–Dallas 2003, pet. denied). To determine if a trial court abused its discretion, we must decide if the trial court acted without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.* 701 S.W.2d 238, 241-42 (Tex. 1985). A claim for prejudgment interest may be based upon general principles of equity or an enabling statute. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985). Under

21

both the common law and the Texas Finance Code, prejudgment interest begins to accrue on the earlier of: (1) 180 days after the date a defendant received written notice of a claim, or (2) the date suit is filed. TEX. FIN. CODE ANN. § 304.104 (Vernon 2006). Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998); *see also Trujillo v. Burrows*, No. 13-08-291-CV, 2009 WL 866827, *2 (Tex. App.–Corpus Christi, Apr. 2, 2009, no pet.) (mem. op.). It is considered compensation allowed by law as additional damages for lost use of the money due between the accrual of the claim and the date of judgment. *Kenneco Energy, Inc.*, 962 S.W.2d at 528.

## C. Analysis

The trial court awarded prejudgment interest in this case based upon what it believed the correct statutory interpretation. The trial court's fact findings confirmed that the award was calculated based upon the date this suit was filed, May 19, 2006. Faulconer argues that it is entitled to prejudgment interest based upon litigation that ensued in 1998 between it and American, Dominion's predecessor. American agreed to provide a defense to Faulconer and that case settled in 1999. As part of the settlement agreement, American agreed to delay further litigation on its indemnity obligation and reserved certain rights. There does not seem to be a dispute that there was a notice of Faulconer's claim in 1996. Dominion argues that the notice in 1996 may not be used to calculate the accrual of prejudgment interest because the case at issue here is a different case. We agree.

There was evidence that Faulconer had incurred $80,502.74 in costs in defending the Ayala litigation to the point where the original case settled. Faulconer reserved its right

22

to seek payment in future litigation that it had incurred up to that time. Faulconer had the right to file suit against Dominion to recover those fees. However, to do so, it had to file a new cause of action because its previous case had settled. We agree with the trial court's decision to grant prejudgment interest based on the filing of the second lawsuit. It was a new claim, even though it was based on rights that had been previously reserved. We overrule Faulconer's cross issue.

## VII. Conclusion

The judgment of the trial court is affirmed.


ROSE VELA
Justice


Delivered and filed the
31st day of August, 2010.

23